Argued April 30, reversed June 18, 1952

# STATE OF OREGON *v.* HENNESSEY

245 P. 2d 875

*James O. Goodwin,* of Oregon City, argued the cause for appellant. With him on the brief was Glenn R. Jack, of Oregon City.

*Walter J. Apley,* Deputy District Attorney, of Oregon City, argued the cause for respondent. With him on the brief were George Neuner, Attorney General, of Salem, Leonard I. Lindas, District Attorney, and Winston L. Bradshaw, Deputy District Attorney, both of Oregon City.

TOOZE, J.

On May 22, 1951, an indictment was returned by the grand jury of Clackamas county, charging defendant Joe Hennessey with the crime of conducting and carrying on a gambling game, in violation of the provisions of § 23-928, OCLA. Defendant entered a plea of not guilty in the circuit court for Clackamas county. Upon stipulation, the case was tried to the court without intervention of a jury. Defendant was convicted and sentenced to pay a fine of $250, and he appeals.

Section 23-928, OCLA, provides as follows:

"Each and every person who shall deal, play, or carry on, open or cause to be opened, or who shall conduct either as owner, proprietor, or employee, whether for hire or not, any game of faro, monte, roulette, rouge et noir, lanquenet, rondo, vingtun (or twenty-one), poker, drawpoker, brag, bluff, thaw, or any banking or any other game played with cards, dice, or any other device, whether

the same be played for money, check, credits, or any other representative of value, shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than $500, and shall be imprisoned in the county jail until such fine and costs are paid; provided, that such person so convicted shall be imprisoned one day for every $2 of such fine and costs; and provided further, that such imprisonment shall not exceed one year.''

Evidence was introduced upon the trial showing that on July 3, 1950, at Molalla, in Clackamas county, defendant conducted and carried on a gambling game known as ''craps'', which game is played with dice, and in which game money was wagered by numerous and divers persons.

On the trial it was disclosed that, in the spring of 1951, the district attorney for Clackamas county was conducting an investigation of gambling activities allegedly existent in that county. As a part of such investigation, the grand jury of the county was called into session, and witnesses were subpoenaed to testify before that body. Defendant Joe Hennessey was one of the witnesses so subpoenaed by the district attorney, and, in obedience to such subpoena, defendant did appear before the grand jury and, under oath, did testify regarding gambling activities at Molalla on July 3, 1950, in which he admitted that he participated. It conclusively appears from the record, and is admitted by the state, that the indictment against defendant in the instant case was based upon the testimony defendant gave before the grand jury. In presenting its case against defendant on the trial, the state called a member of the grand jury to testify as to the admissions defendant made as a witness before the investigating body.

The record also discloses that in another prior trial on a gambling charge, which involved the same gambling game involved here, and wherein one Logsdon was the defendant, the defendant Joe Hennessey was subpoenaed by Logsdon as a witness and testified on behalf of that defendant. While a witness in that case, upon cross-examination by the district attorney, and without objection, Hennessey in part testified:

"Q Your occupation is what, Mr. Hennessey?
"A I am a gambler.

"Q And you were running the gambling game at Frank's Place on July 3, 1950?
"A Yes, I was.

"Q That is the one you are referring to now in your testimony in answer to Mr. Jack's questions?
"A I dealt in a crap game."

It also appears from the record that during the course of defendant's testimony before the grand jury a wire recording was made of a portion thereof. This wire recording was destroyed prior to trial.

Mr. Victor Amoth, a member of the grand jury, was called as a witness by the state and testified as follows:

"Q Mr. Amoth, at the time the defendant was brought into the Grand Jury room, as you have heretofore stated, he was given some advice by the district attorney. Would you relate to the Court exactly, if you recall, what advice was given to him, prior to the time he testified, by the district attorney?
"A I will try to, as nearly as I can. My recollection is, the district attorney said, 'Mr. Hennessey, you have been asked to appear before this Grand Jury to answer certain questions, and I will admonish you now that you are doing it of your own free will, that anything you say may be held against

you, that you need not answer any of the questions if you don't want to, but that if you are willing for the Grand Jury to proceed on this basis you will be required to take an oath,' at which time Mr. Hennessey answered that he was willing to answer questions or be any help that he could be, or something like that, at which time the oath was administered.''

Upon cross-examination, he further testified:

''Q  Mr. Amoth, when was it that Mr. Hennessey appeared before the Grand Jury?

''A  The latter part of April, 1951. I am just trying to think about the date,—on April 26, or thereabouts.

''Q  And do you know whether or not he appeared in response to a subpoena?

''A  I think so.

''Q  And did he appear just once?

''A  No, I think Mr. Hennessey was there twice.
''  *  *  *  *  *

''Q  Describe in detail everything that happened in the Grand Jury room. Where did Mr. Hennessey sit in the Grand Jury room?

''A  Yes, I can tell you that. Directly across the desk from Mr. Lindas' desk, facing the Grand Jury.

''Q  And was there any contrivance or apparatus there at the time?

''A  Yes.

''Q  What was it?

''A  A wire recorder set.

''Q  A wire recording set?

''A  Yes.

''Q  Who brought in the wire recording set?

''A  That was in that office when I got there that morning.

''Q  That morning? Was that the first time he [sic] had been used in the Grand Jury room?

''A  It was the only time I have ever appeared as a member of the Grand Jury.

"Q And who ordered the wire recording set turned on?

"A Mr. Lindas operated that.

"Q And was it operated during the time Mr. Hennessey testified?

"A For a period.

" *  *  *  *  *

"Q And you feel that he was first advised by the district attorney and then administered the oath?

"A Yes.

"Q Did the district attorney explain to him that he could refuse to answer any single question, for example?

"A I couldn't answer that. I don't recall him making any reference to any single statement. I don't recall the district attorney—

"Q I will refresh your memory. Didn't Mr. Hennessey refuse to answer a couple of questions during the time he was being questioned in the Grand Jury room?

"A Yes, I think there was. I don't recall what those questions were now.

"Q But you do recall specifically he refused to answer a couple of questions?

"A Yes, I believe he did.

" *  *  *  *  *

"Q [By the court.] It has made some impression on your mind because you recall he chose not to answer the question.

"A Yes, that is true; and up to that time, I am sure I knew then, but my recollection is the information received from Mr. Hennessey, which the Grand Jury used as the basis of the indictment.

"Q I don't think I understand the answer.

"A I believe I ought to elaborate a little bit. What I mean is, the part of the interview,—if I may call it that—I directly remember is that part of it which the Grand Jury accepted and used as the

basis for the indictment, if I may put it that way. That, of course, I would now remember.

"Q But there were some questions he didn't want to answer?

"A That was my impression.

" * * * * * *

"Q [By Mr. Jack.] Just an additional question. Would it refresh your memory if I attempted to quote the foreman of the Grand Jury when Mr. Hennessey refused to answer one of those questions, as follows: 'Mr. Hennessey, you are under oath; the questions we are asking you are solely for the purpose of this Grand Jury and the things that transpire here will never leave this room.' Do you remember such a statement as that?

"A Not from the foreman. I don't remember such a statement from the foreman, but I do remember statements made by the district attorney.

"Q To that effect?

"A Yes."

At the outset of the trial, and while Mr. Amoth was upon the witness stand, the district attorney propounded to him the following question:

"Q I will ask you whether or not, in answer to questions propounded, he [the defendant] made any admissions concerning the operation of a gambling game at Lowes' Place at Molalla the 3d day of July—"

Whereupon counsel for defendant interposed the following objection:

"If the Court please, in this connection I wish to object to that question on the grounds and for the reason that I will be able to show that the defendant was subpoenaed before the Grand Jury and he appeared before that Grand Jury in response to a subpoena; and, furthermore, that the evidence thus far offered does not come within the purview of the statute showing that the defendant was fully ad-

vised, and any testimony that he had therefore given would not be admissible in this hearing. Furthermore, on the grounds and for the reason that the statutes of the State of Oregon specifically provide that if testimony was given under such circumstances, the defendant would be immune from prosecution in any proceeding relating to the testimony given at that time, under those circumstances.''

The trial court did not rule upon the objection at that time. However, throughout the trial and at every opportunity, defendant's counsel renewed the objection. When the state rested, defendant moved the court as follows:

''At this time, the State having rested, the defendant moves the Court for an order quashing the indictment on the grounds and for the reason that it now appears from the record that the indictment was issued by the Grand Jury upon testimony given by the defendant, himself, in response to a subpoena where he appeared before the Grand Jury, at which appearance he was advised of his rights but in which testimony he refused to answer some questions, but upon being advised by the district attorney that the testimony so given was considered secret or at least only for the purpose of that particular body, testimony was then given; and on the further grounds and for the further reason that the record discloses that the defendant in this case testified in another criminal case in response to a subpoena and in that testimony the district attorney, outside of the range and scope of direct examination, with full knowledge of the fact that this particular indictment was set for trial today, asked the defendant a direct question as to whether or not he had operated this particular gambling on the 3rd of July, 1950, at Molalla; and, therefore, having forced the defendant to answer, the defendant is entitled to the immunity granted by the section of the code that we have heretofore referred to * * * .''

In denying the motion, the trial court said:

"THE COURT: If I take the record as it is, and there is nothing to the contrary,—that he was advised he didn't have to testify and that his testimony might be used against him, it would be an implication that he testified voluntarily and waived whatever privilege he had. It is my conclusion that if the witness, or the defendant in this case, had not been advised of his constitutional right that he would have immunity; but, having been advised of his right, and in the condition of the record, I feel the motion must be denied. That is the order."

Defendant duly excepted to the ruling of the court, and as his first assignment of error on this appeal asserts that "the court erred in denying defendant's motion to quash the indictment."

Defendant bases his entire contention upon the provisions of § 23-932, OCLA. He maintains that this statute is self-executing. He asserts that one who has been compelled to testify concerning the matters contemplated by the statute need claim no privilege against self-incrimination, because, as he claims, the legislature has withdrawn the constitutional privilege and substituted in its place unconditional immunity. The answer we give this question will be decisive of this case.

Section 23-932, OCLA, provides as follows:

"No person otherwise competent as a witness under the laws of this state shall be disqualified from testifying as such concerning the offenses mentioned in this act on the ground that his testimony may criminate himself. Such testimony shall be reduced to writing, and no indictment or prosecution shall afterwards be brought against him for the particular offense concerning which he testified as a witness."

Section 23-933, OCLA, provides:

"If any person who shall have been summoned

as a witness on the part of the prosecution shall fail or refuse to attend at the time fixed for trial, without a reasonable excuse, the person so failing or neglecting shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than $50 nor more than $200, or by imprisonment in the county jail not less than twenty-five days nor more than three months, or by both such fine and imprisonment, in the discretion of the court.''

Both of these sections of our code are as originally adopted by the legislature in 1876 by an act entitled ''An Act to prevent and punish Gambling''. Oregon Laws 1876, p. 39. That Act contained 13 sections, § 9 now being § 23-932, OCLA, and § 10 now being § 23-933, OCLA.

Section 23-932, OCLA, provides immunity only in cases involving gambling transactions, and is in no sense general.

The Fifth Amendment to the Constitution of the United States provides in part as follows:

'' * * * nor shall [any person] be compelled in any criminal case to be a witness against himself * * *.''

Article I, § 12, of the Oregon Constitution provides:

''No person shall be put in jeopardy twice for the same offense, nor be compelled in any criminal prosecution to testify against himself.''

An excellent treatise upon the historical background of these constitutional provisions is to be found in 21 Va LR 763.

Under these provisions, no person can be compelled in any criminal case to be a witness against himself. As a witness, he may refuse to answer any question that would tend to incriminate him, claiming his constitutional privilege. But it is necessary that he

claim the privilege. It is a personal privilege that may be waived, and, if not claimed, is deemed waived. Also, by testifying in his own behalf, an accused waives the benefit of the constitutional guaranty. *State v. Deal,* 52 Or 568, 98 P 165; *State v. Bartmess,* 33 Or 110, 121, 54 P 167.

■ However, the effect of § 23–932, OCLA, is to withdraw the constitutional privilege against self-incrimination in gambling cases. Under this statute, any person subpoenaed as a witness by the state in a gambling prosecution must testify, irrespective of whether or not his testimony will incriminate himself. He cannot refuse to answer, but he it not without protection. The state by this statute trades absolute immunity from prosecution for the individual's constitutional privilege against self-incrimination. The constitutionality of this statute has not been questioned in this case, and, by what is said in deciding the issue before us, we do not wish to be understood as indicating any opinion that it is or is not constitutional.

The only question remaining for determination is whether under this statute one must affirmatively claim his protection before testifying, in order to preserve his rights to immunity from prosecution.

Under some statutes and under some constitutional provisions, providing immunity in certain cases, it has been held that the accused must claim the privilege against self-incrimination in order to obtain immunity, and, if not claimed, he is deemed to have waived it. For example, see *Scribner v. State,* 9 Okla Cr 465, 132 P 933, Ann Cas 1915B, 381; *People v. Carter,* 297 Mich 577, 298 NW 288.

■ But under statutes such as that of this state, we are of the opinion it is unnecessary for a person to claim the privilege against self-incrimination in order

to be protected. The statute is self-executing, and, when a person is subpoenaed by the state to testify in a gambling case, and testifies, he cannot be thereafter prosecuted for any offense connected with the transaction as to which he is forced to provide evidence. The subpoena itself is sufficient compulsion to make the immunity effective, without the person going further and affirmatively claiming his constitutional privilege before obeying the mandate of the statute. When the law itself compels one to testify, it would certainly be an odd requirement that one must defy the statute in order to obtain its benefits. The law never requires vain and useless things.

The true rule and the reasons therefor are well stated in *People v. Sharp*, 107 NY 427, 14 NE 319, 332, 1 Am St Rep 851. At page 332 of 14 NE, it is said:

"As, therefore, it cannot be said that the committee was without power to compel the witness, and require his testimony, the respondents must find elsewhere reasons, if there are any, in support of the proposition that the evidence was by a willing witness. To that end, it is further said, in behalf of the people, that Sharp, by not asserting his privilege before the committee, waived it. But if the case comes within the purview of section 79, supra, of that act, the senate subpoena and the resolution of the senate were compulsory, and it was not necessary for the protection of the witness that he should, either by deed or word, set either at defiance, or refuse to obey the summons, or refuse to answer the questions of the committee. It is enough if he was obliged by law to answer the inquiry; and he could not be required, in order to gain the indemnity which the same law afforded, to go through the formality of an objection or protest which, however made, would be useless. In People v. Kelly, supra, the witness did plead his privilege, but it was of no avail, because he was

obliged by law to answer the inquiries, and the law was held imperative and sufficient, although the case was one within the very terms of the constitution, because, by the same law, he was protected against the consequences of his admissions. Whether he asserted his privilege, or whether he was silent and submissive to the laws, could make no difference. The legislature, for reasons of public interest, required a discovery of the whole truth as to matters involved in their inquiry, and one answering in compliance with their command cannot be deemed a willing or consenting person within the meaning of the maxim, *volenti non fit injuria,* on which respondent relies. A person who yields from the necessity of obedience cannot be said to have the power of acting by his own choice; and where the law says he shall be compelled to attend, and shall be compelled to testify, acquiescence is not election, and he is not one of whom it can be said he receives no injury from that to which he willingly and knowingly agrees and consents. There can be no volition where there is neither power to refuse, nor opportunity to elect. Under such circumstances, the witness must be deemed to speak for the safety of his person, and in view of the indemnity which the law promises. A man is none the less robbed because, yielding to irresistible power, he makes no resistance; and a witness who gives up his secret at the command of the law is as much under compulsion as if he ventured on the punishment that would follow on his refusing to disclose it. In People v. Kelly there was the plea of privilege, but it availed nothing, because the law required an answer. The position of the witness was in no respect changed by the plea. In the Keeler Case, supra, there was refusal to answer, under the advice of counsel, but it availed nothing. It seems to us that the evidence of Sharp before the committee was given under the penalty of commitment and imprisonment for contempt, and consequently that it was obtained from him by compulsion. To refuse to attend the com-

mittee or testify would, moreover, have rendered the witness guilty of a misdemeanor. Sections 68, 69, Pen. Code.''

In *U. S. v. Monia,* 317 US 424, 87 L ed 376, 63 S Ct 409, there was involved a provision of the Sherman Act, reading in part as follows:

"  *  *  *  no person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify or produce evidence, documentary or otherwise, in any proceeding, suit, or prosecution under said Acts [the Interstate Commerce Act, the Sherman Antitrust Act, and other acts]; *Provided further,* that no person so testifying shall be exempt from prosecution or punishment for perjury committed in so testifying.''

An indictment had been returned charging appellees with conspiracy to fix prices in violation of the Sherman Act. The appellees filed special pleas in bar, each alleging that, in obedience to a subpoena duly served, he appeared as a witness for the United States before the grand jury inquiring respecting the matters charged in the indictment, and gave testimony substantially connected with the transactions covered by the indictment. No question was made but that the testimony so given did substantially relate to the transactions which were the subject of the indictment. The United States demurred to the pleas as insufficient, since neither alleged that the witness asserted any claim of privilege against self-incrimination, and, therefore, neither the Fifth Amendment nor the immunity statute could avail him.

At page 426 of 317 US, the Supreme Court, speaking through Mr. Justice Roberts, said:

"Beyond dispute the appellees were entitled to immunity from prosecution if the statute is to be

given effect as it is written. We are asked, however, to read into it a qualification to the effect that immunity is not obtained unless the privilege against self-incrimination is claimed. Inasmuch as the statute is addressed to this privilege, and the privilege is accorded by the Fifth Amendment, it is said that if immunity is offered as a substitute for the privilege, the immunity, like the privilege, ought to be claimed; that thus the statute and the Fifth Amendment, which are *pari materia,* will be given a consistent construction.

"In the second place, it is urged that qualification of the forthright terms of the statute is necessary in order to avoid an unreasonable, unfair, and unintended result. The argument runs that if the statute is construed automatically to grant immunity without a claim of privilege, the prosecutor is at a disadvantage, since he does not know whether, or to what extent, a witness may have participated in a crime; and so runs the risk of unintentionally affording immunity. On the other hand, so it is said, the witness has full knowledge as to the nature of his own conduct, and as to his possible incrimination by testimony, and it is not unfair to require him to claim his privilege and so put the prosecutor on notice that, if he insists upon the testimony, the witness will obtain immunity.

"The well-understood course of legislation before and after the adoption of the statute involved, and the legislative history, compel rejection of the contentions.

"The Fifth Amendment declares that 'No person * * * shall be compelled in any criminal case to be a witness against himself.' An investigation by a grand jury is a criminal case. The Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment.

"" * * * * *

"The legislation involved in the instant case is plain in its terms and, on its face, means to the layman that if he is subpoenaed, and sworn, and testifies, he is to have immunity. Instead of being a trap for the Government, as was the original Act, the statutes in question, if interpreted as the Government now desires, may well be a trap for the witness. Congress evidently intended to afford Government officials the choice of subpoenaing a witness and putting him under oath, with the knowledge that he would have complete immunity from prosecution respecting any matter substantially connected with the transactions in respect of which he testified, or retaining the right to prosecute by foregoing the opportunity to examine him. That Congress did not intend, or by the statutes in issue provide, that, in addition, the witness must claim his privilege, seems clear. It is not for us to add to the legislation what Congress pretermitted."

See also *People v. Schwarz,* 78 Cal App 561, 248 P 990, 993; *State v. Petteway,* 121 Fla 822, 164 So 872, 873; Note, 145 ALR 1416.

■ It is the duty of the courts to zealously protect the constitutional liberties of the individual, and never permit them to be frittered away by some fine-spun legal technicality. Neither legislative attrition nor judicial erosion of constitutional rights should ever be countenanced. The rule of strict construction in favor of the individual must be applied to every statute that directly or indirectly infringes upon his constitutional protections. It must ever be borne in mind that the principal objective of the written constitution is the preservation of human liberty; its first ten amendments, fortified by the Fourteenth, have for their sole purpose the protection of the individual. These constitutional rights and privileges are sacred, and must be so regarded by the courts.

■ Because he was compelled by subpoena to appear and testify before the grand jury respecting the matters upon which the indictment against him is based, defendant's motion to quash the indictment should have been sustained. A hearing before a grand jury is a proceeding or "trial" within the meaning of § 23-933, OCLA, supra, and any person summoned as a witness on the part of the state must attend in obedience to the command of the subpoena.

■ However, defendant was not entitled to immunity because of the testimony he gave as a witness on the trial of Logsdon. That does not come within the purview of the statute. It is only where one is compelled to testify at the instance of the prosecution that the state grants immunity. As a witness subpoenaed by the defendant on the Logsdon trial, this defendant could have claimed his constitutional privilege against self-incrimination and refused to answer the questions propounded to him, but he asserted no such claim and, therefore, waived the privilege.

The judgment is reversed and this cause remanded with directions to quash the indictment and discharge the defendant.