347

Argued and submitted October 12, 1992, affirmed June 23, appellant's reconsideration filed July 16 allowed by opinion October 6, 1993

See 123 Or App 582, 859 P2d 1201 (1993)

STATE OF OREGON,
*Respondent,*

*v.*

STEVEN MARTIN GORHAM,
*Appellant.*

(91-40636; CA A74086)

854 P2d 971

Steve P. Chez, Eugene, argued the cause for appellant. With him on the brief was Chez & Carp, Eugene.

Janie M. Burcart, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Rossman,* Presiding Judge, and Edmonds and De Muniz, Judges.

De MUNIZ, J.

---

* Rossman, P. J., *vice* Buttler, J., retired.

## De MUNIZ, J.

Defendant appeals his conviction for unlawfully taking a deer. ORS 496.162; ORS 496.992. He contends that the court erred by denying his motion to dismiss on the ground that he was immune from prosecution. He also contends that the court erred by denying his motion to suppress evidence that was seized during a warrantless search of his barn. We affirm.

We take the historical facts from the court's findings and the evidence that is consistent with them. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968); *State v. Huckaba*, 115 Or App 728, 730, 839 P2d 768, *rev den* 315 Or 272 (1992). Officer Richardson was at home on Thanksgiving evening, when the telephone rang at 9:30 p.m. The caller[1] told Richardson that he had seen a spotlight and car headlights on defendant's property and had heard what sounded like a shot from a large caliber rifle. The caller indicated that he thought a deer had been poached. Richardson put on his uniform and began driving toward defendant's house. He radioed for a backup, and Sergeant Cantu followed him.

Richardson and Cantu arrived at defendant's home at 10:30 p.m. It was raining. "No Trespassing" and "No Hunting" signs were posted on trees in a fenced field next to defendant's driveway, but the officers did not see them. The gate to defendant's driveway was open, and the officers drove about 150 yards down the driveway to where defendant was standing near the entrance to a barn. The light in the barn was on and the door was open. As Richardson drove up, defendant stepped into the barn and was just inside the door when Richardson arrived. Richardson saw that defendant had blood and hair on his hands. He asked defendant where the deer was, and defendant pointed to his right. A deer carcass was lying on a plastic sheet in the barn. Richardson shined his flashlight at the deer and saw that it was not "field dressed" and that it had a fresh head wound.

Richardson heard a noise in the unlit portion of the barn, but defendant told him that there was nobody there. Richardson told Cantu to take a look. As Cantu went toward

---

[1] The caller's identity was not revealed either at the hearing on the motion to suppress or during the trial.

the back of the barn, Midlam emerged from underneath a trailer. He, too, was covered with blood and hair. Richardson asked defendant and Midlam for their identification and hunting licenses. Midlam did not have a hunting license. Defendant admitted that he had shot the deer. Richardson checked the deer's temperature and took a serum sample from one of its eyes to determine the time of its death.[2] He asked defendant if he had a deer tag, and defendant said that he did, but it was on another deer that he had already butchered and was storing in his freezer. Richardson inquired as to the whereabouts of the gun that defendant had used to kill the deer that was in the barn. Defendant led Richardson to the house, and they went in to get the gun. Richardson seized the gun, a deer tag and an empty shell casing.

The officers arrested defendant and Midlam for various game offenses. The same attorney represented both defendants. Midlam was tried first, and the attorney subpoenaed defendant as a witness at Midlam's trial. Without asserting his rights under the Fifth Amendment or Article I, section 12, defendant testified that he had killed the deer with the aid of car headlights and that he did not have a valid deer tag. Midlam was found not guilty of the charges against him.

Defendant moved to dismiss the charges against him, claiming that ORS 496.710 conferred transactional immunity on him, because he had been compelled by the subpoena to testify and incriminate himself at Midlam's trial. The court denied his motion. The court found defendant not guilty of exceeding the bag limit and not guilty of hunting with the aid of an artificial light. It found him guilty of taking a deer unlawfully.

■ We first address defendant's contention that he was immune from prosecution. ORS 496.710 provides:

"In any action or proceeding for the enforcement of any of the provisions of the wildlife laws * * * no person shall be excused from testifying concerning any offense committed by another or by the person on the ground that the testimony of

_____

[2] For an explanation of how to estimate the time since death by measuring the potassium concentration in the vitreous humor, see Brady, *Medical Investigation of Deaths in Oregon* 43-44 (2d ed 1976).

the person may incriminate the person. However, such testimony shall not be used against the person in any prosecution for any crime or misdemeanor under the laws of the state, nor shall the person be subject to any criminal prosecution or any penalty or forfeiture for or on account of any transaction, matter or thing concerning which the person has been compelled to testify or to produce evidence, documentary or otherwise."

Defendant argues that the legislature's grant of transactional immunity is self-executing, *i.e.*, the statute confers immunity without requiring defendant to make any attempt to invoke his right to remain silent.[3]

In *State v. Hennessy*, 195 Or 355, 245 P2d 875 (1952), the court held that a similar statute was self-executing, but only if the defendant was subpoenaed to testify by the district attorney. Hennessy had been indicted for conducting and carrying on a gambling game, in violation of *former* OCLA § 23-928.[4] Hennessy had previously testified in two proceedings about the gambling activity that led to his indictment. On one occasion, Hennessy was subpoenaed by the district attorney to testify before the grand jury, which was investigating gambling crimes. He testified, without objection, that he had participated in gambling activities in Molalla on July 3, 1950. On another occasion, Hennessy testified at the trial of Logsdon, who was being tried on charges that arose from the same gambling game. Hennessy had been subpoenaed as a defense witness in that case. On cross-examination, the prosecutor asked Hennessy if he had been running the gambling game in Molalla, and Hennessy admitted that he had been.

At his own trial, Hennessy contended that he was immune from prosecution because of his previous testimony. At the time, *former* OCLA § 23-932[5] provided:

---

[3] Defendant relies on *State v. Strance*, 95 Or App 488, 769 P2d 793 (1989), in which we held that transactional immunity granted by ORS 471.770 is self-executing. However, the Supreme Court implicitly overruled that holding in *7455 Incorporated v. OLCC*, 310 Or 477, 800 P2d 781 (1990).

[4] *Former* OCLA § 23-928 was codified in 1953 at ORS 167.505, *amended by* Or Laws 1959, ch 530, § 3, and *repealed by* Or Laws 1971, ch 743, § 432.

[5] *Former* OCLA § 23-932 was codified in 1953 at ORS 167.520, and *repealed by* Or Laws 1971, ch 743, § 432.

"No person otherwise competent as a witness under the laws of this state shall be disqualified from testifying as such concerning the offenses mentioned in this act on the ground that his testimony may criminate [*sic*] himself. Such testimony shall be reduced to writing, and no indictment or prosecution shall afterwards be brought against him for the particular offense concerning which he testified as a witness."

The Supreme Court observed that OCLA § 23-932 withdrew the constitutional privilege against self-incrimination in gambling cases. 195 Or at 366. In holding that the defendant was immune from prosecution, even though he had not attempted to invoke his right to be silent, the court reasoned:

"The subpoena itself is sufficient compulsion to make the immunity effective, without the person going further and affirmatively claiming his constitutional privilege before obeying the mandate of the statute. When the law itself compels one to testify, it would certainly be an odd requirement that one must defy the statute in order to obtain its benefits. The law never requires vain and useless things." 195 Or at 367.

The court concluded:

"[A]ny person summoned as a witness on the part of the state must attend in obedience to the command of the subpoena." 195 Or at 372.

However, the court observed that Hennessy's testimony at Logsdon's trial would not have automatically conferred transactional immunity:

"It is only where one is compelled to testify at the instance of the prosecution that the state grants immunity. As a witness subpoenaed by the defendant at the Logsdon trial, [Hennessy] could have claimed his constitutional privilege against self-incrimination and refused to answer the questions propounded to him, but he asserted no such claim and, therefore, waived the privilege." 195 Or at 372.

The structure of ORS 496.710 is virtually identical to that of *former* OCLA § 23-932. The court's conclusion, that Hennessy was not immune from prosecution on the basis of Logsdon's subpoena, was dictum. Nonetheless, we find the court's assessment to be persuasive. We hold that the state's statutory grant of transactional immunity under ORS

496.710 is self-executing only when the defendant's previous testimony has been compelled by the state.

◼       Defendant testified at Midlam's trial, but he was not under subpoena by the state. Instead, he was subpoenaed by the same lawyer who represented him at his own trial. He made no effort to quash the subpoena or to invoke his constitutional rights against compelled self-incrimination. He answered his own lawyer's questions about the events that led to his and Midlam's arrest. Defendant's testimony at Midlam's trial did not render him immune from prosecution. *State v. Hennessy, supra*, 195 Or at 372. The court correctly denied his motion to dismiss.

Defendant also contends that the court erred by denying his motion to suppress the evidence that Richardson seized during the warrantless search of the barn. He contends that, when Richardson and Cantu entered his driveway, they did not have probable cause to believe that he had committed any offense. He also contends that, even if they had probable cause, their failure to obtain a warrant was inexcusable, because there were no exigent circumstances that would have provided an exception to the warrant requirement.

◼       We need not decide whether the officers had probable cause when they entered defendant's driveway, because that was not an impermissible intrusion into a privacy interest protected by either Article I, section 9, or the Fourth Amendment.[6] The trial court found that the no trespass signs on the adjacent field did not establish that defendant intended to restrict access to his driveway. That finding is supported by the evidence. There was a fence separating the field from defendant's driveway, and defendant had left the gate to the driveway open. Contrary to defendant's contention, the officers' passage down the driveway was not unlawful. *State v. Corbett*, 15 Or App 470, 516 P2d 487 (1973), *rev den* (1974).

◼       When Richardson approached defendant, who was standing just inside the barn door, he saw that defendant was covered with blood and hair. He asked defendant where the

---

[6] Defendant makes no reference to either the state or federal constitution as support for his claim that the entry was unlawful.

deer was, and defendant pointed to it. It was in plain view.[7] Richardson could see that the deer's head wound was recent. Richardson testified that the last legal shooting hours that day were before 5:00 p.m. Richardson testified that

> "having this deer in the barn with fresh blood running out of it and a big gaping fresh wound in its forehead and not being field dressed this long after legal shooting hours, [I concluded that the] deer had been just taken recently."

The court found that, because of Richardson's experience in enforcing game laws, he had probable cause to believe that the deer had been shot after the legal shooting hours, which likely would have involved the unlawful use of an artificial light.

■        The final issue is whether exigent circumstances authorized the officers to begin searching the barn without a warrant. An important factual issue in this case was the time at which the animal was killed. The evidence that would be relevant to that issue included the deer's body temperature, which would be dropping as the carcass cooled, and the serum sample that Richardson removed from its eye. Richardson testified that poachers erase all traces of their crime within two hours and that, if he delayed to get a warrant, defendant would have had the opportunity to butcher the deer and remove the evidence. Defendant testified that he could "dress down" a deer in 45 minutes. The delay that would have been involved in obtaining a warrant would have risked the loss of relevant evidence. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991); *State v. Parras*, 110 Or App 200, 203, 822 P2d 151 (1991).

Exigent circumstances were coupled with probable cause to believe that defendant had committed game offenses and that his barn contained evidence of those offenses. The warrantless search was lawful. The court correctly denied defendant's motion to suppress.[8]

Affirmed.

---

[7] Defendant does not contend that Richardson's use of the flashlight constituted an unlawful search.

[8] Defendant does not argue that the search of his house was unlawful. Apparently, he has abandoned any objection he may have had to the seizure of the gun, the shell casing and the deer tag from his house. *Nelson v. Emerald People's Utility Dist.*, 116 Or App 366, 372, 840 P2d 1384 (1992); *Hilt v. Bernstein*, 75 Or App 502, 512, 707 P2d 88 (1985), *rev den* 300 Or 545 (1986).