Argued and submitted May 6, affirmed October 27, 1999

In the Matter of
Joshua L. Reeves and Jared Reeves, Minor Children.

STATE ex rel JUVENILE DEPARTMENT
OF COOS COUNTY,
*Appellant,*

*v.*

Joshua L. REEVES
and Jared Reeves,
*Respondents.*

(JV7154, JV7155; CA A101679 (Control), A101752)
(Cases Consolidated)

988 P2d 433

Jonathan H. Fussner, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Steven H. Gorham argued the cause and filed the brief for respondents.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

HASELTON, J.

## HASELTON, J.

In this juvenile proceeding involving allegations of game-related offenses[1] against two adolescent brothers, the state appeals from an order of suppression. The trial court concluded that the investigating officer unlawfully entered the property where the brothers lived with their father. We agree that the officer's initial entry onto the property was unlawful. We further conclude that brothers' father could not effectively retroactively consent to the unlawful invasion of brothers' privacy interests. Accordingly, we affirm.

The material facts are as follows: On October 12, 1998, Trooper Pearson of the Oregon State Police Fish and Wildlife Division received a teletype that an anonymous caller had reported that "[Brothers], who live at North Way in North Bend, have shot four bucks and a spike so far this year and none have been tagged. All are hanging in a shop at the residence." In response to the teletype, Pearson drove to the property where brothers lived with their father. The property was completely fenced, with the exception of a gated driveway leading 150 to 200 yards from the public road to the residence. Three "Keep Out - No Trespassing" signs were fixed at intervals on the fence between the property and the public road. When Pearson reached the driveway, he saw a sign posted on the fence next to the gate that read:

> "PRIVATE ROAD
> NO UNAUTHORIZED PERSONS
> BEYOND THIS POINT."[2]

Pearson testified that he understood the sign to mean that the property owner wanted to exclude people who did not have "a legitimate reason to be there," but that he believed that he was authorized to enter because he wished to contact brothers to discuss the game-violation report. Pearson drove

---

[1] Both brothers were charged with acts that would constitute the crime of failure to tag a deer, ORS 496.162, one brother was charged with exceeding the bag limit on buck deer, ORS 498.002, and the other brother was charged with unlawfully taking a spike deer. ORS 498.002.

[2] At the suppression hearing, the parties disputed whether, when Pearson arrived, the gate was open or closed and chained but not locked. Given our analysis and disposition as to the lawfulness of Pearson's entry, we need not resolve that dispute.

up the driveway, parked beside the house, and got out of his car. He saw a garage roughly 50 feet away, and, because the garage door was raised about four or five feet, he could see the hindquarters of two skinned deer hanging inside the garage.

At that point, brothers' father came out of a barn next to the house, and Pearson introduced himself. Father did not, at that time or at any time thereafter, tell Pearson that he was trespassing, ask him to leave, or give any other indication that Pearson was unwelcome on the property.

After engaging in some small talk, Pearson then "asked [father] if he would mind if I checked the tags on the deer that I could see hanging in the garage." Pearson testified that father "told me to help myself." After further discussion about the number of deer in the garage and whether they were tagged, Pearson again asked if they could go take a look in the garage, and father said they could.[3] Pearson and father then walked over to the garage together, father rolled the garage door the rest of the way up, and they entered the garage. Once inside, Pearson saw four untagged buck deer carcasses, one of which was a spike deer.

Brothers were charged with having committed acts that, had they been adults, would constitute the crimes of failure to tag a deer, ORS 496.162, exceeding the bag limit on buck deer, ORS 498.002, and unlawfully taking a spike deer. ORS 498.002. Before trial, brothers moved to suppress all evidence obtained following Pearson's warrantless entry onto the property, asserting, *inter alia*, that that entry was unlawful because the clearly posted sign, "PRIVATE ROAD NO UNAUTHORIZED PERSONS BEYOND THIS POINT,"

---

[3] At the hearing, father testified that he never gave Pearson consent or permission to look in the garage. However, based on its belief that the "officer's testimony was probably more accurate," the trial court made a specific finding that Pearson's search of the garage was a "consensual search." We defer to the trial court's credibility-based finding that, contrary to the father's testimony, he did, in fact, explicitly agree that Pearson could search the garage. *See Short and Short*, 155 Or App 5, 18, 964 P2d 1033 (1998) ("Although our review is *de novo*, because the trial court is in a better position to assess the credibility of the witnesses, we defer to the trial court's assessment of the witnesses' credibility * * *."). *Accord State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993) (in non-*de novo* review of suppression rulings, reviewing court is bound by trial court's findings of fact if those findings are supported by constitutionally sufficient evidence).

expressly manifested an intent to exclude the public. The state responded that (1) the posted sign did not adequately exclude all members of the public because it suggested that persons with "legitimate business" were free to enter, and (2) even if Pearson's initial entry on the property was unlawful, father's subsequent consent to Pearson's request to search the garage retroactively ratified, and validated, Pearson's initial unlawful entry. The state did *not* argue, under *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993), that father's consent to the search of the garage was not the product of exploitation of any prior illegality in entering the property and, that, thus, regardless of whether the initial entry was unlawful, the search of the garage was lawful.

The trial court rejected the state's arguments. The court concluded that the driveway sign was "sufficient warning and sufficient expression of the intent" to exclude the public from the property. Moreover, although making a specific finding that, after Pearson's initial unlawful entry, the "rest of the search"—*i.e.*, the search of the garage—was consensual, the court implicitly rejected the state's "retroactive consent" argument. Accordingly, the court granted brothers' motion to suppress.

The state appeals, reiterating its alternative arguments that Pearson's entry was lawful and that, in all events, father, by consenting to the search of the garage, necessarily retroactively consented to Pearson's antecedent "trespass." As amplified below, we reject both arguments.

*State v. Dixson/Digby*, 307 Or 195, 766 P2d 1015 (1988), and its progeny, frame our analysis of the lawfulness of Pearson's initial entry. In *Dixson/Digby*, the Supreme Court announced that "the search and seizure provision in the Oregon Constitution [, Article I, section 9,] protects land outside the 'curtilage' of a residence" under certain conditions:

> "An individual's privacy interest in land he or she has left unimproved and unbounded is not sufficient to trigger the protections of Article I, section 9. Thus, it is not sufficient that the property in question is privately owned, or that it is shielded from view by vegetation or topographical barriers, because those features do not necessarily indicate the

owner's intention that the property be kept private. *A person who wishes to preserve a constitutionally protected privacy interest in land outside the curtilage must manifest an intention to exclude the public by erecting barriers to entry, such as fences, or by posting signs.* * * * [I]f land is fenced, posted or otherwise closed off, one does not enter it without permission or, in the officers' situation, permission or a warrant." 307 Or at 211-12 (emphasis added).

Applying that rule, the court concluded that the officers had not conducted an illegal search by entering the defendants' property. The court reasoned that, although the defendants had posted "No Hunting" signs and blocked vehicle access to their property with a cable across the road, the signs and cable did not express an intent to exclude persons from the property entirely, such as for uses other than hunting. *Id.*

In several post-*Dixson / Digby* cases, we have considered whether a landowner's posting of a sign or signs on the property manifests a clear intent to exclude the public, thereby creating a protected privacy interest in the property under the Oregon Constitution. For example, in *State v. Gorham*, 121 Or App 347, 353, 854 P2d 971, *rev den* 318 Or 171 (1993), we concluded that, where the defendant had posted "No Trespassing" and "No Hunting" signs on trees in a field adjacent to the defendant's driveway but separated from it by a fence, the signs did not "establish that the defendant intended to restrict access to his driveway." Similarly, in *State v. Gabbard*, 129 Or App 122, 877 P2d 1217, *rev den* 320 Or 131 (1994), the defendant had posted "Keep Out" and "Beware of Dog" signs near the beginning of his driveway, which the officers did not see, and a "No Trespassing" sign on a boundary fence next to the driveway, which the officers did see. We concluded that the signs at the beginning of the driveway did not manifest an intent to exclude because the officers, in good faith, failed to see them.[4] We further concluded that the sign on the boundary fence did not adequately convey an intent to exclude because "[a] reasonable

---

[4] We employed similar reasoning in *State v. Hitesman / Page*, 113 Or App 356, 361, 833 P2d 306, *rev den* 314 Or 574 (1992), where we concluded that, because the defendants' two "No Trespassing" signs were "old, faded and difficult to see," one of the signs was "not very legible," and the property was not fenced, the

visitor could have assumed that that sign was intended only to exclude those who might put the property to their own uses, but that it did not apply to visitors who desired to contact the residents." *Gabbard*, 129 Or App at 128.

Conversely, in *State v. Poulos*, 149 Or App 351, 942 P2d 901 (1997), we concluded that the defendant's signs succeeded in manifesting a clear intent to exclude the public from accessing his residence via the driveway. There, the defendant had posted a sign directly to the right of the driveway entrance reading "No·Hunting or Trespassing Under Penalty of Law," a "Guard Dog On Duty" sign beyond that, and a large red "STOP" sign further up the driveway. We rejected the state's argument that only a gate or barrier could sufficiently express an intent to exclude the public from entering a driveway, and concluded that "[t]here was no evidence that even the customary casual visitor would be welcome on [the] defendant's property." *Poulos*, 149 Or App at 356-57.

■■ In this case, the state argues that the driveway sign, "PRIVATE ROAD NO UNAUTHORIZED PERSONS BEYOND THIS POINT," did not effectively exclude the public. The state's principal argument is that the sign excluded only "unauthorized persons," and that "any ordinary citizen" would reasonably understand that "a person [like Pearson] having legitimate business with [brothers' family] would be sufficiently 'authorized' to drive up the driveway and ring the doorbell."[5] Defendants respond that the totality of the circumstances, and the wording of the sign in particular, clearly evinced an intent to exclude any person who did not have permission to enter. We agree with defendants.

---

circumstances did not "give the police objectively reasonable notice that their entry onto the land was unlawful." *Cf. State v. Poulos*, 149 Or App 351, 356 n 1, 942 P2d 901 (1997) (declining to decide "what effect, if any, an officer's failure to see posted signs might have on determination" of landowner's intent to exclude the public).

[5] The state also argues that intent to exclude the public could be manifested only with a "physical barrier to access." That argument fails in light of our holding in *Poulos* that signs alone demonstrated that "defendant wished to have his privacy respected." 149 Or App at 357 (citing *Dixson/Digby*, 307 Or at 211 ("In this society, signs, such as 'No Trespassing' signs, the erection of high, sturdy fences and other, similar measures are all indications that the possessor wishes to have his privacy respected.")).

Here, the sign on the property was posted on the fence immediately to the right of the driveway gate. The sign was plainly visible,[6] and Pearson testified that he saw the sign. Both the location of the sign and its express reference to the driveway ("Private Road") make it clear that the sign related to the driveway—and not, *see, e.g., Gorham*, 121 Or App at 353, to the field behind the fence.

■ We further reject the state's assertion that the words "unauthorized persons" expressed an intent to exclude only persons "without legitimate business" on the property. Rather, an objectively reasonable member of the public would understand that "authorization" to enter must be obtained from the property owner—and not from the putative trespasser's self-assessment of the legitimacy of his or her business. If the state's view were correct, then political canvassers, religious proselytizers, and Girl Scouts selling cookies could all invade the property in their service of some perceived greater good. In this connection, we emphasize that police officers are no more "authorized" than anyone else to invade property, absent the legal sanction of a warrant or some exigency. Pearson's initial entry onto the property was, consequently, unlawful.[7]

We proceed to the state's alternative "retroactive consent" argument. Relying on *State v. Weaver*, 319 Or 212, 874 P2d 1322 (1994), the state argues that, in the totality of the circumstances, father's express consent to Pearson's request to search the garage constituted effective retroactive consent to Pearson's antecedent trespass. We disagree.

At the outset, we emphasize, and reiterate, that the state is *not* arguing that, under *Rodriguez*, father's consent to the search of the garage rendered that search lawful regardless of any prior illegality. The state did not make a *Rodriguez*-based argument to the trial court, *see* 163 Or App at 501,

---

[6] Photographs of the gate and sign were admitted as exhibits.

[7] Because we conclude that the fencing and sign alone manifested a clear intent to exclude the public, we need not resolve the dispute as to whether the driveway gate was open or closed and chained. *See Poulos*, 149 Or App at 357 (property owner "not required to indicate further that [he] wished to have [his] privacy respected").

and appellate counsel candidly acknowledged that omission. The state's alternative argument rests solely on *Weaver*.

■ In *Weaver*, several officers began searching the defendant's secondhand store for evidence of violations of certain county ordinances without a warrant or consent. While that search was in progress, a deputy contacted the defendant store owner at another location to ask for his consent to search the store. 319 Or at 214-15. Without any knowledge of the search in progress at his store, and several hours after the officers started searching his store, the defendant signed a written consent form. The state argued that the defendant's consent retroactively validated the search and seizures that occurred before he consented. The Supreme Court agreed with the state that a consent *could* "relate back" to validate an otherwise unlawful earlier search. *Id.* at 221-22. However, such retroactive consent can be found only where there is evidence "that the person giving the consent intended the consent to be retroactive." *Id.* Applying that rule, the court concluded that the evidence did not demonstrate that the defendant intended to retroactively consent to the earlier search.[8]

In *State v. Larson*, 159 Or App 34, 977 P2d 1175, *rev den* 329 Or 318 (1999), we addressed *Weaver*'s application to a purported retroactive consent to search given by a third party, and not by the defendant. There, police officers, without prior consent, entered a common area at the rear of an apartment building and, from that point, smelled the odor of marijuana wafting from the defendant's second floor apartment. Several months later, after being charged with drug offenses, the defendant moved to suppress evidence discovered as a result of the officers' observations, arguing that the

---

[8] A concurring opinion highlighted that aspect of the court's holding:

"The effect of our decision today is to say that, although the scope of a consent to search is a question of fact, *in the absence of any evidence as to that issue, the default outcome is that a consent is treated for the purposes of Article I, section 9, of the Oregon Constitution, as being intended to be prospective only.* This means, in any case in which the prosecution wishes to rely on consent as a basis for obtaining evidence that was acquired before the consent was given, that there must be affirmative evidence (that is accepted by the trial judge) that it was the intention of the person giving consent to include within the scope of that consent the earlier official conduct." *Id.* at 222-23 (Gillette, J., concurring) (emphasis in original).

officers' unconsented to and warrantless entry into the rear area was unlawful. Thereafter, the police obtained written consent from another tenant that purported to explicitly authorize the initial entry. The trial court granted the motion to suppress, and the state appealed.

In affirming, we rejected the state's argument that the third-party tenant's "consent" validly effectuated retroactive consent under *Weaver*:

> "The state is correct that, in *Weaver*, under some circumstances, a defendant's consent may 'relate back' to the beginning of a search if there is evidence in the record that the defendant intended the consent to be retroactive. By consenting to the search after the fact, the defendant is essentially waiving any objection to the unlawfulness of the earlier police conduct. This case, however, presents a different question from *Weaver* because the consent here was not obtained from the defendant but, rather, from a third party. We decline to hold that, under the circumstances here, a third party may waive the unlawfulness of police conduct with respect to the defendant." *Larson*, 159 Or App at 42-43.

Thus, our premise in *Larson* was that retroactive consent is "essentially" a matter of waiver and that a third party cannot waive a prior violation of another person's constitutionally protected interests.

■ That principle is conclusive here. In entering the property unlawfully, Pearson violated not only father's privacy interests but brothers' as well. Father could, by retroactive consent, waive that violation as to himself. But he could not waive that violation as to his sons.

The trial court properly allowed the motion to suppress.

Affirmed.