## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## MICHAEL EUGENE HOCKEMA,
*Defendant-Appellant.*

Coos County Circuit Court
11CR0075; A148940

333 P3d 1134

Peter Gartlan, Chief Defender, and Laura A. Frikert, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Doug M. Petrina, Senior Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and Wollheim, Judge, and Schuman, Senior Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

This appeal arises following a stipulated facts trial that found defendant guilty of 11 counts of felon in possession of a firearm, ORS 166.270, one count of unlawful possession of MDMA,[1] ORS 475.874, and one count of unlawful possession of marijuana, ORS 475.864. Defendant assigns error to the trial court's denial of his motion to suppress evidence obtained as a result of two deputy sheriffs' initial entry onto defendant's property. We conclude that the entry was lawful, and affirm.

We review the trial court's denial of a motion to suppress for errors of law. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005). We are bound by the trial court's findings of historical facts if they are supported by constitutionally sufficient evidence in the record. *Id.* We presume that any facts not expressly found by the trial court were decided in a manner consistent with the trial court's ultimate conclusion. *Id.*

Defendant's home is located in Coos Bay on the south side of Luscombe Loop, a paved road that travels east and west. The house and attached garage are facing north toward Luscombe Loop. The garage is on the west side of the house, facing the road, and the front door of the house is on the east side, also facing the road but set back from it.[2] Running parallel along the front of the house—from east to west near Luscombe Loop—is a three-to-four-foot high wire fence that begins at the east side of defendant's property and ends just before the entry to defendant's three-car-wide driveway. The driveway is the access point to defendant's property; it is about as wide as the entire house and leads from Luscombe Loop a short distance to the garage. A dirt pathway from the driveway crosses defendant's front yard to the front door.

Facing north, on the west side of defendant's driveway is a second access dirt road that leads from Luscombe

---

[1] MDMA is 3, 4-methylenedioxymethamphetamine, commonly known as "ecstasy."

[2] The trial court found that the door was facing east, but a photograph in the record indicates that the door faces north toward the road.

Loop to the rear of defendant's property. The dirt road runs parallel to defendant's driveway and is separated from the driveway by a dense laurel hedge. The dirt road has a gate that is set back several feet from Luscombe Loop and is bordered by the laurel hedge on the east side and a fence on the west side that runs parallel with Luscombe Loop to the west end of defendant's property. The trial court found that the dirt access road is separated enough from the house that it would be unclear to an "objective observer" that the dirt access road is attached to the property where defendant's house is located. Nevertheless, if the gate to the dirt access road is closed, defendant's driveway is the only portion of his property along Luscombe Loop that is neither fenced nor gated.

At the time that the officers entered defendant's property, there were a number of signs posted along the perimeter of the property facing Luscombe Loop. There were two "No Trespassing" signs posted on the fence in front of the house, one of which was attached to the fence post immediately adjacent to the east side of the driveway entrance. There were also signs posted around and near the dirt access road that led to the rear of defendant's property—a "No Trespassing" sign on the gate, at least one "No Trespassing" sign on the adjacent fence, and a traffic "Stop" sign that had been secured into the ground near the gate. Additional signs were posted along the fence which paralleled Luscombe Loop and led from the dirt access road to the west end of defendant' s property, although the trial court found that some of those signs were not visible from Luscombe Loop.

On April 30, 2010, before 10:00 p.m., Coos County Deputy Sheriffs Datan and Slater drove to defendant's residence in search of another man, Evans, whom they were investigating for multiple violations of a restraining order. The sheriff's office records indicated that Evans' had the same address as defendant. Traveling east on the road, the deputies arrived at the west end of defendant's driveway. Slater parked his car in defendant's driveway and Datan parked his car along the road. Before contacting defendant, neither deputy knew that defendant resided at the residence, nor had the deputies been to the residence. The deputies did

not pass the gate to the dirt road and did not know that the gate was open that night. The officers did not see any of the signs. After parking their cars, the two deputies followed the dirt path to the front door.

While standing on the front porch, the officers knocked on the front door. Defendant opened the door. The deputies asked if Evans was present and explained why they were looking for Evans. Defendant explained that Evans resided in a trailer behind the house. The deputies asked for and received defendant's consent to go to the trailer. Defendant walked with the deputies, pointing out the trailer, and then defendant returned to the residence.[3] Evans was not at the trailer. The deputies returned to the front door of the residence and requested defendant's consent to search the home for Evans. Defendant voluntarily consented to the deputies entering the residence and searching for Evans. Datan searched for Evans, and Slater remained in the living room with defendant and his fiancé. As part of that search, Datan entered a closet in the master bedroom to see if Evans was hiding there. While looking in the closet, Datan saw the butt stock of a rifle and a box of ammunition. Datan did not find Evans. The search took about five minutes, and the deputies then left the residence.

Once outside, Datan requested a records check on defendant and discovered that defendant was a convicted felon and, therefore, not entitled to possess a firearm. The deputies requested and received a search warrant the following day. The search of the residence led to the discovery of the evidence that led to defendant's indictment and convictions.

Defendant moved to suppress all of the evidence obtained as a result of the deputies' first contact with him at his front door.[4] Defendant argued that the deputies'

---

[3] All of the witnesses at the motion to suppress hearing described the first contact by the deputies with defendant as uneventful.

[4] At the motion to suppress hearing, defendant conceded that, if the trial court found that the deputies did not trespass on defendant's property when they entered the property and knocked on the front door, and if the trial court found that defendant voluntarily consented to the search of the residence for Evans, then the affidavits in support of the search warrant were sufficient to establish probable cause to conduct the search of the residence. In his brief, defendant's

entry on to his property was an illegal trespass and argued that the evidence was illegally obtained in violation of his rights against "unreasonable searches and seizures" under Article I, section 9, of the Oregon Constitution. The trial court denied the motion because it concluded that, based on the facts that it found from the evidence, the deputies' entry on defendant's property was not a trespass and did not violate Article I, section 9.

Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Article I, section 9, protects an individual's "privacy interest"—an "interest in freedom from certain forms of governmental scrutiny." *State v. Dixson/Digby*, 307 Or 195, 206, 766 P2d 1015 (1988). Where the interest in question is the right to privacy on one's property, a person can exclude police officers from entry onto the property outside the curtilage of the dwelling if the person "manifest[s] an intention to exclude the public by erecting barriers to entry, such as fences, or by posting signs." 307 Or at 211-12.

"[A] person impliedly consents to visitors going to the front door of [a] person's house, provided the person has not manifested an intent to forbid the intrusion of casual visitors onto the property." *State v. Gabbard*, 129 Or App 122, 126-27, 877 P2d 1217, *rev den*, 320 Or 131 (1994). In *State v. Somfleth*, 168 Or App 414, 425, 8 P3d 221 (2000), we stated:

"[T]hat presumptive treatment is not necessarily conclusive: A homeowner can abrogate the presumption of implied consent to approach the front door by undertaking sufficient steps to exclude casual visitors from the front yard. Conversely, the presumption that other invasions of the curtilage are trespasses can be overcome by evidence

___

focus is on the deputies' initial entry onto defendant's property. That is appropriate given the trial court's findings that defendant voluntarily consented to the deputies' request to search the residence for Evans.

that the homeowner has sufficiently implicitly or explicitly invited entry."

(Citation omitted.)

There is no question that the fence in front of the house, posted with some "no trespassing" signs, manifested defendant's intent to exclude people from his front yard. There is also no question that, if the gate is closed, defendant has manifested an intent to keep people from entering the dirt road. The question here is whether, under the totality of circumstances, those signs and barriers were sufficient to objectively manifest defendant's intention to prohibit all casual visitors from entering the open driveway and approaching defendant's front door.

The trial court concluded that they did not. In particular, it emphasized what a stranger would observe if approaching defendant's house from the west. As already stated, the trial court found that the dirt access road with the signs was separate enough from defendant's house that it was unclear that it was associated with the house. Moreover, the court concluded that the signs and gate on and around the dirt road were far enough off Luscombe Loop that it was unlikely that a person driving into the driveway from the west would see the signs or gate on the dirt road. As to the signs on the fence in front of the house, the trial court concluded that, "[o]bjectively, approaching from the west and entering the driveway at night, it is easy to see how a sign on the gate post on the east side (the far side) of the driveway might not be noticed."

Defendant argues that the trial court gave undue weight to the fact that no sign was posted on the west side of the driveway, and thus that the deputies, arriving on the west side of the driveway, saw no signs barring their entry. "[T]he law does not require a property owner to litter his property with signs," defendant argues. Moreover, defendant also contends that he had fenced almost all of his property and had posted multiple "No Trespassing" signs. Finally, defendant argues that the fencing and the multiple posted signs gave "objectively reasonable notice" of his intent to exclude visitors. He points to *State v. Poulos*, 149 Or App 351, 356, 942 P2d 901 (1997), in which we concluded

that, regardless of the absence of a gate barring entry to the defendant's driveway, the "cumulative effect" of posted signs evidenced the defendant's intention to exclude the public from his property. He also relies on *State v. Roper*, 254 Or App 197, 201-02, 294 P3d 517 (2012), *rev den*, 353 Or 714 (2013), in which we concluded that the defendant had evidenced an intent to exclude the public by fencing his entire property and placing "No Trespassing" signs within several feet of both sides of his driveway. However, both cases present facts distinguishable from the facts of this case.

In *Poulos*, a steep, narrow, single-vehicle driveway led one-quarter mile from the highway to the defendant's residence. 149 Or App at 353. At the entrance to the driveway, a sign that was posted on a tree to the right side of the driveway stated, "No Hunting or Trespassing Under Penalty of Law." *Id.* Another sign attached to a post on the left side of the driveway stated "Posted—No Hunting." *Id.* Further up the driveway were three signs that stated, respectively, "KEEP OUT," "Guard Dog on Duty," and "STOP." *Id.* The two officers who entered the property both saw the sign posted to the right of the driveway, and each saw some of the signs further up the driveway. *Id.* The trial court concluded that, under the totality of the circumstances, the defendant evidenced an intention to exclude the public from his property, and we affirmed, noting the serial effect of the signs on the driveway:

> "Before entering the driveway, a visitor was told not to trespass; that admonition was followed by a warning sign for a guard dog; that warning, in turn, was followed by the command to 'Stop.' There was no evidence that even the customary casual visitor would be welcome on defendant's property."

*Id.* at 356-57 (footnotes omitted).

In *Roper*, entrance to the defendant's property was obtained by means of a driveway with a "No Trespassing" sign posted four feet to the left of the driveway and another "No Trespassing" sign posted farther away to the right. 254 Or App at 198. The driveway had a gate with a no trespassing sign attached to it. *Id.* On the day the officers entered the property, the gate was open and only the back side of

the sign attached to the gate was visible. *Id.* The officers saw none of the signs, but the trial court concluded that a reasonable person would have seen the signs on either side of the driveway and would have at least stopped and looked at the other side of the gate to see what the sign attached to the gate said. *Id.* at 199-200. On the basis of the trial court's findings regarding the signs and the fact that the defendant's property was entirely fenced, we concluded that the defendant had objectively manifested an intention to exclude the public. *Id.* at 201. We noted that an individual's manifest intention to exclude the public "depends on the factual circumstances in each case." *Id.* at 202. The trial court's findings were consistent with its legal conclusion, and because there was "constitutionally sufficient evidence in the record to support the trial court's findings[,]" we affirmed the trial court's suppression of the evidence. *Id.*

In both *Poulos* and *Roper*, the defendants made their intention regarding the driveway entrance objectively evident by placing signs on both sides of the driveway, as well as posting other signs at the driveway entrance or further along the driveway. *See also State ex rel Juv. Dept. v. Reeves*, 163 Or App 497, 503, 988 P2d 433 (1999), *rev den*, 330 Or 71 (2000) (holding that a sign posted immediately adjacent to the driveway, which stated," PRIVATE ROAD NO UNAUTHORIZED PERSONS BEYOND THIS POINT," was sufficient evidence of the defendant's intention to exclude the public from the property). The message was that visitors were not to use the driveway.[5]

In this case, although defendant posted many signs along his property, only two signs—those posted on the fence east of the driveway—were potentially related to the driveway. As to the other signs—all of which were posted west of the driveway—the trial court found that some of the other

---

[5] In *State v. Cam*, 255 Or App 1, 296 P3d 578, *adh'd to on recons*, 256 Or App 146, 300 P3d 208, *rev den*, 354 Or 148 (2013), we reviewed the trial court's denial of a motion to suppress. The defendant argued that "Private Property" signs and a gate, although opened, demonstrated the defendant's intention to exclude all visitors from his property. *Id.* at 6. We concluded that the defendant had not manifested a clear intention to exclude visitors. 255 Or App at 6. Each case depends on its factual circumstances. *Roper*, 254 Or App at 202. The factual circumstances in *Cam* are sufficiently distinguishable from this case that a more detailed description of *Cam* would not aid in our decision here.

signs were so far off Luscombe Loop that they would not be visible to a person driving to defendant's home. The trial court further found that the signs posted on and around the dirt road would not be considered part of defendant's house and its curtilage. *See State v. Gorham*, 121 Or App 347, 854 P2d 971, *adh'd to on recons*, 123 Or App 582, 859 P2d 1201, *rev den*, 318 Or 171 (1993) (concluding that no trespassing signs on an adjacent field were not indicative of defendant's intent, where a fence separated the field from the open driveway).

Consequently, according to the trial court's findings, the only signs that would have signified an intention regarding defendant's home were the two signs on the fence in front of the home—only one of which was immediately adjacent to the driveway, and neither of which the deputies saw when they entered the driveway. Although determining whether defendant intended to exclude visitors from entering his property cannot depend on which direction a visitor enters the driveway, the fact that a sign was posted only on one side of a wide driveway and that the officers did not see that sign is significant.[6] Moreover, once the deputies entered the driveway, there was nothing that barred or warned them from following the dirt path to the front door.

A reasonable person could have interpreted the two signs posted on the fence in at least two different ways. The posted signs could have manifested an intention only to keep visitors out of defendant's front yard, but expressed nothing about using the driveway to approach the front door. *See Gabbard*, 129 Or App at 128 (holding that a reasonable visitor could have concluded that a "No Trespassing" sign posted on a fence running along the side of the driveway "was intended only to exclude those who might put the property to their own uses, but that it did not apply to visitors who desired to contact the residents"). The two signs posted

---

[6] We note that defendant does not argue that the deputies deliberately avoided seeing the signs. *See Gabbard*, 129 Or App at 128 (holding that officers' failure to see the signs was relevant to whether the defendant objectively manifested an intent to exclude, where there was no contention that officers deliberately avoided seeing the signs). There is also nothing in the record of this case, or in the trial court's findings, that indicates that the deputies deliberately ignored defendant's signs.

on the fence, one of which was posted directly adjacent to the left side of the driveway, could have also manifested an intention to keep individuals from entering any part of defendant's yard and buildings. Although both interpretations are plausible, in light of the fact that there is evidence to support both interpretations and we are to resolve the competing interpretations consistently with the trial court's ultimate conclusion, *Poulos*, 149 Or App at 356, and further, in light of the fact that the burden is on defendant to rebut the presumption that an individual impliedly consents to the casual visitor going to the front door, *Gabbard*, 129 Or App at 126-27, we conclude that the trial court did not err in concluding that defendant failed to objectively manifest an intention to exclude visitors from coming to his front door.[7]

We therefore conclude that, under the totality of circumstances in this case, the deputies did not violate Article I, section 9, when they contacted defendant at his front door, and the trial court did not err in denying defendant's motion to suppress.

Affirmed.

---

[7] The trial court indicated that, in making its decision, it considered the fact that the deputies entered the driveway at night. In light of our conclusion that the "No Trespassing" signs on the fence did not, by themselves, objectively manifest an intention to keep visitors from going to the front door, we express no opinion as to whether the fact that barriers or signs are not visible in the dark is probative of a person's intention.