Argued and submitted April 30, 1998, affirmed March 17, petition for review denied August 17, 1999 (329 Or 319)

## STATE OF OREGON,
*Appellant,*

*v.*

## JUDAH S. LARSON,
*Respondent.*

## (96-08-36103; CA A96052)

977 P2d 1175

Jonathan H. Fussner, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Dan Maloney, Deputy Public Defender, argued the cause for respondent. With him on the brief was Sally L. Avera, Public Defender.

Before De Muniz, Presiding Judge, and Deits, Chief Judge, and Haselton, Judge.

DEITS, C. J.

## DEITS, C. J.

The state seeks reversal of the trial court's pretrial order, ORS 138.060(3), suppressing evidence seized pursuant to a search warrant that was based, in part, on information obtained when officers went into an area behind defendant's apartment and smelled the odor of marijuana emanating from a ventilation tube protruding from a window in defendant's upstairs apartment. We affirm.

In April 1996, the Portland Police Bureau received information that the occupants at 1340 S.E. Tacoma were growing marijuana. Defendant lived at that address. In July, Officers Keist and Riley went to defendant's apartment and knocked on the door. Nicole Gagnier, sister of defendant's girlfriend, answered the door and allowed the officers into the apartment. Nicole told the officers that she was visiting her sister, Karen Gagnier, who lived in the apartment with defendant. Neither defendant nor Karen was home. Inside the apartment, the officers saw a towel pushed against the bottom of a closed door and a small picture of a marijuana plant sitting on a table in the living room. The officers asked Nicole to contact defendant or Karen. Nicole called her sister, Karen, at work. Officer Keist asked Karen if there was marijuana growing inside the apartment. She said that she didn't know, that the officers should talk to defendant. The officers then paged defendant who returned the page by calling the apartment. Defendant refused the officers' request for consent to search his apartment and told them to leave, which they did.

The officers waited outside the apartment for defendant to return. While they were waiting, they walked to what they described as a "common area" at the rear of the apartment building and stood below a second-story window of defendant's apartment. From this vantage point they saw a ventilation system using a dryer hose, in the screen of the window of defendant's apartment. Both officers reported that they could smell a definite marijuana odor coming from the ventilation system. Defendant arrived at the apartment a short time later. He again refused to consent to a search of his apartment. He was arrested and, based, in part, on the information obtained by the officers while they were in the back

area, a warrant was obtained to search defendant's apartment. During the search, the officers found a marijuana-growing operation of 14 plants in a bedroom.

There are two floors in defendant's building. The area behind defendant's building, where the officers stood to see the ventilation system and smell the marijuana, is a small strip of land about 10-feet wide. It is bounded on the west by the back of the apartment building and on the east and south by a poorly maintained wooden slat fence. Access to the strip of land behind the building can be gained by going around the north side of the building or by passing through a gate at the southwest corner of the building.

The apartment on the first floor, directly under defendant's apartment, has a sliding glass door that opens to a small concrete slab surrounded by barkdust. The downstairs resident, Marilyn Lipko, refers to this area as her

patio. Access to Lipko's patio can be gained by going through the gate at the southwest corner of the building or by going along the strip behind the building. The tenants of the second-story apartments have no direct access from their apartments to the Lipko patio area or to the strip behind the building. Lipko had posted a sign on the gate at the southeast corner of the back area, facing north, that read "We like you but *not* in our backyard. *Please* KEEP OUT!" Defendant testified that he did nothing on his own to exclude people but that he depended on Lipko's sign. A friend of defendant testified that she generally did not see people in the yard area behind defendant's apartment but that she "might see kids occasionally[.]"

At the hearing on the motion to suppress, the state sought to introduce a note signed by another tenant of the building, Bashaw, in which she stated that she gave retroactive consent to the police to search the area behind her apartment. The address of Bashaw's apartment was 1334 S.E. Tacoma, but the exact location of her apartment was not identified at the suppression hearing. The trial court refused to admit the note, concluding that, although Bashaw may have had equal access to the back area, retroactive consent is legally invalid, and that, therefore, such evidence would be irrelevant.

The trial court concluded that the area behind defendant's apartment was part of the common area of defendant's apartment building and that defendant, as a cotenant, had a privacy interest in it. The court also held that the officers violated defendant's privacy interest when they entered that area. Consequently, the court struck the portion of Officer Keist's affidavit in support of the search warrant, in which she stated that she had smelled marijuana coming from the vent in defendant's apartment window. The court then concluded that, without the evidence discovered during the search in the back area, the affidavit failed to establish probable cause to support the warrant. Accordingly, the court granted defendant's motion to suppress the evidence found during the search of defendant's apartment pursuant to the warrant.

On appeal, the state assigns error to the trial court's suppression order. It argues that the officers did not violate defendant's privacy interests when they entered the area behind the building because the area was not sufficiently private, as to defendant, to violate such interests. The state argues alternatively that the evidence of retroactive consent from Bashaw should have been admitted and that that consent authorized the search.

■■     The state's first argument turns on whether the officers invaded a privacy interest protected by Article I, section 9, of the Oregon Constitution,[1] when they entered the narrow strip of land running behind defendant's apartment building and made their observations. The privacy rights granted by the Oregon Constitution are not defined by a reasonable expectation of privacy, but in terms of "the privacy to which one has a *right*." *State v. Campbell*, 306 Or 157, 164, 759 P2d 1040 (1988) (emphasis in original). The privacy rights protected by Article I, section 9, are defined by an objective test of whether the government's conduct "would significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his privacy." *State v. Dixson/Digby*, 307 Or 195, 211, 766 P2d 1015 (1988). "One indication of whether a government action intrudes on a person's privacy right is whether a private individual would offend social and legal norms of behavior by engaging in the same kind of intrusion." *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995).

The trial court began its analysis of the issues presented by the motion to suppress by considering whether the area in question was within the curtilage of defendant's residence. The court concluded that the area was within the curtilage and went on to explain that even though this was a common area for the tenants of the apartments, that fact did not defeat the apartment dwellers' right to privacy in the area. Based on these findings, the trial court concluded that defendant's privacy interests had been violated.

---

[1] Article I, section 9, of the Oregon Constitution, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."

■■ The factors used to determine whether an area is within the curtilage of a private dwelling are often relevant in assessing whether a particular area of an apartment complex is one in which an individual has privacy rights for purposes of Article I, section 9.[2] Nonetheless, because of the differences between a typical single-family dwelling and multiple-family dwellings, a strict application of the traditional curtilage doctrine to apartment dwellings should not be determinative of whether privacy rights exist. We believe that the better approach is to evaluate whether a privacy right exists based on the application of general legal principles relating to privacy interests to the circumstances of each case. Of particular significance is the physical layout of the living units and the residents' use of the area in question.

That is essentially what we have done in the cases in which we have decided whether a privacy right under Article I, section 9, has been violated by a police officer's entry into an area surrounding an apartment dwelling. *See State v. Erb,* 135 Or App 421, 899 P2d 716, *rev den* 322 Or 421 (1995) (under particular circumstances, officer's entry into apartment complex parking lot did not impair defendant's freedom from scrutiny); *Portrey,* 134 Or App 460 (although defendant had impliedly consented to visitors coming to his apartment door, he retained a privacy interest in articles not entirely visible to someone standing on his doorstep); *State v. Breshears / Oliver,* 98 Or App 105, 779 P2d 158 (1989) (defendants had a privacy interest in side yard of their apartment which was surrounded by a fence, apartment buildings and brush and reached by walking across a grassy area off the walkway); *State v. Roles,* 75 Or App 63, 705 P2d 227 (1985) (because roof area was accessible only from defendant's second-floor apartment, it was a protected area).

---

[2] The pertinent factors in determining whether an area is within the curtilage of a private dwelling are

"its proximity or annexation to the dwelling, its inclusion within the general enclosure surrounding the dwelling and its use and enjoyment as an adjunct to the domestic economy of the family." *State v. Russo,* 68 Or App 760, 763, 683 P2d 163 (1984) (citing *Care v. United States,* 231 F2d 22, 25 (10th Cir 1956), *cert den* 351 US 932 (1956)).

Here, the area in question was adjacent to the apartment building and was partially enclosed by a fence. However, there was open access to the area through a walkway in the center of the building. The area appeared to function somewhat as a common backyard for the apartment's residents. Children occasionally played there, one resident had a cement patio area there and the area provided access for all of the residents of the building to the back of their units to do maintenance work such as washing windows or adjusting window screens. As we have recognized before, in determining whether police entries into backyards of private dwellings violate privacy interests, backyards are generally, by nature, more private than areas in the front of a house. We stated in *State v. Ohling*, 70 Or App 249, 253, 688 P2d 1384, *rev den* 298 Or 334 (1984):

> "Going to the back of the house is a different matter. Such an action is both less common and less acceptable in our society. There is no implied consent for a stranger to do so. '[W]e do not place things of a private nature on our front porches that we may very well entrust to the seclusion of a backyard, patio or deck.' *State v. Corbett,* 15 Or App 470, 475, 516 P2d 487 (1973), *rev den* (1974)."

The backyard of an apartment dwelling, of course, offers less privacy to the tenants. That is particularly true of an area such as this that functions as "a common" backyard of the tenants. However, the fact that a common area of an apartment building is involved is not, in itself, determinative of whether a privacy interest exists. Although the area was available for use by all of the tenants, and perhaps their guests, it was not available for use by other members of the public. The presence of an individual, other than a resident or guest, in the back area peering up at the second-floor windows would offend social and legal norms of behavior.

In addition, the sign posted by apartment resident, Lipko, on the fence at the southeast corner of the back area that read "We like you but *not* in our backyard. *Please* KEEP OUT!" supports the conclusion that defendant had privacy interests in that area. The state points to Lipko's testimony, that she did not intend the sign to exclude the police, to argue that the sign is not evidence of an intent to exclude the public from the area. However, the test is an objective one and,

viewed objectively, the words of the sign did not limit who it was intended to exclude. Rather, the words manifest an intent to exclude the public. *See State v. Glines,* 134 Or App 21, 24, 894 P2d 516, *rev den* 321 Or 512 (1995) (citing *State v. Wacker,* 317 Or 419, 425, 856 P2d 1029 (1993), and *Dixson / Digby,* 307 Or at 211). Accordingly, the sign is a further indication that the apartment residents did have privacy interests in the area. We conclude that the officers' entry into the back area violated privacy interests protected by Article I, section 9.

■     The state next argues that, even if the officers violated defendant's privacy when they walked behind his apartment, their actions were justified by the consent that they subsequently obtained from one of defendant's neighbors. On November 20, 1996, the day before the suppression hearing, Officer Keist returned to defendant's apartment building and obtained a handwritten document from Bashaw, a tenant in another apartment. The document purported to give Bashaw's consent for police officers to "go on the east side, back of [her] apartment." The document further said "I also now give my permission for officers to have been on the east side, back area of my apartment when the officers were here investigating a marijuana grow earlier this year."

■     The state argues that under *State v. Weaver,* 319 Or 212, 874 P2d 1322 (1994), consent may "relate back" and validate a prior search as long as there is evidence that the person giving consent has actual authority to give it and intends for the consent to relate back to the prior search. The state is correct that, in *Weaver,* under some circumstances, a defendant's consent may "relate back" to the beginning of a search if there is evidence in the record that the defendant intended the consent to be retroactive. By consenting to the search after the fact, the defendant is essentially waiving any objection to the unlawfulness of the earlier police conduct. This case, however, presents a different question from *Weaver* because the consent here was not obtained from the defendant but, rather, from a third party. We decline to hold that, under the circumstances here, a third party may waive the

unlawfulness of police conduct with respect to the defendant.[3] The trial court did not err in concluding that Bashaw's retroactive consent did not provide authority for the officers' entry into the area behind defendant's apartment.

We conclude that the trial court was correct in excising the portion of the affidavit in support of the search warrant that was a result of the officers' entry into the area behind defendant's apartment. The state has not argued that probable cause exists without the excised portion of the affidavit and, therefore, we affirm the court's suppression of the evidence seized under the warrant.

Affirmed.

---

[3] Defendant also argues that the introduction of the retroactive consent would be improper because, in effect, it adds additional facts to the affidavit supporting the search warrant. Because of our disposition, we need not reach that issue.