Argued and submitted February 25, reversed and remanded July 13, petition for
review denied September 20, 1994 (320 Or 131)

# STATE OF OREGON,
*Appellant,*

*v.*

# LARRY RAY GABBARD,
*Respondent.*

(92CR2329; CA A78813)

877 P2d 1217

Jonathan H. Fussner, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Jesse Wm. Barton, Deputy Public Defender, argued the cause for respondent. With him on the brief was Sally L. Avera, Public Defender.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

LEESON, J.

**LEESON, J.**

Defendant was indicted for possession, manufacture and delivery of a controlled substance, and conspiracy to manufacture and to deliver a controlled substance. ORS 475.992; ORS 161.450. The trial court granted his pretrial motion to suppress evidence, and the state appeals. We reverse.

The following facts were found by the trial court and are supported by evidence. On September 20, 1992, Detective Looney of the Coos County sheriff's office received an anonymous tip, through a dispatcher, that defendant and Jerry Spikes were "cooking" methamphetamine at defendant's property. The caller told the dispatcher that the property was four miles up East Catching Slough Road, at the end of a gravel driveway, past another house. The caller also said that Spikes was driving a blue or grey four-door sedan.

Looney was familiar with defendant's property, because he had been there in April, 1992, looking for defendant's sister on a request from Douglas County. At that time, defendant had helped Looney search the house and the nearby shed. Looney had found some of defendant's sister's personal items in the shed, but had not located her. As Looney was leaving, defendant told him to "come back any time," and said that he was not "into drugs any more." Based on that experience, Looney recognized the caller's description of the property as accurate.

Looney was also familiar with Spikes. He recognized the caller's description of Spikes' car as generally accurate. Looney recalled, and confirmed, that there was an outstanding warrant for Spikes' arrest.

After dark that evening, Looney drove to defendant's property, accompanied by Detective Ranger. Signs near the beginning of defendant's driveway warned "Beware of Dog" and "Keep Out." The signs were not immediately adjacent to the driveway, and Looney and Ranger did not see them. The driveway passed a neighboring house and a fence that ran perpendicular to the driveway, marking the boundary between the neighbor's and defendant's property. The officers saw a "No Trespassing" sign on that fence. No gate or other obstruction blocked the driveway at that or any other

point. On defendant's property, the driveway passed near his shed and ended in front of his house. The shed and the house were about 30 yards apart. The officers drove about 20 yards past the shed and parked between the shed and the house.

As Looney got out of the police truck, he noticed defendant coming out of the shed. As the shed door opened, Looney could see that there was a light on inside. He could also see light escaping through cracks in the siding. Looney and defendant walked towards each other. Defendant walked past Looney and went up to Ranger. Looney recognized the distinctive odor of P2P, a precursor chemical that is used to manufacture methamphetamine, coming from defendant as defendant walked past him. Looney also believed, based on his training and experience, that defendant was under the influence of methamphetamine.

As defendant spoke with Ranger, Looney walked over to the shed. Looney, who is six feet tall, bent down to look through a crack in the siding about four and one-half feet above the ground. He observed an operating methamphetamine laboratory inside the shed. He smelled the odor of P2P and heard the gurgling of chemical reactions. He also saw Spikes standing silently in the far corner of the shed.

Looney yelled, "Meth lab!," and ordered Spikes out of the shed. Ranger immediately arrested defendant, searched him and seized money and methamphetamine from him. Looney placed Spikes under arrest. Looney knew that a working methamphetamine laboratory poses a risk of explosion, especially if it is shut down at the wrong time. Spikes told Looney that it was safe to shut down the lab, and Looney did so.

Ranger read *Miranda* warnings to defendant and Spikes. They both indicated that they understood the warnings. Ranger asked defendant for consent to search the house. Defendant said that he did not care. Looney then conducted a security sweep of the residence and seized two guns. Based on Looney's affidavit relating the above events, he obtained and executed a search warrant for the house.

Defendant filed a pretrial motion to suppress evidence derived from the officers' allegedly unlawful entry onto his property. The state filed a pretrial motion to admit "all

statements made by defendant to * * * police officers, including but not limited to September 20, 1992[.]"[1] After a hearing, the trial court ruled that the officers' entry onto defendant's property to make contact with defendant at his house was lawful. However, the court held that Looney's view into the shed was an unlawful search, and that the evidence at issue was all obtained by or derived from that search. It granted defendant's motion to suppress, and denied the state's motion to admit defendant's statements.

On appeal, the state argues that the trial court erred in ruling that Looney's view into the interior of the shed was a search. Alternatively, it contends that the trial court erred in ruling that the search was not justified by probable cause and exigent circumstances. As we discuss below, we agree with the state that the search was justified by probable cause and exigent circumstances. However, because a chronological discussion of the events in this case facilitates the analysis, we begin with defendant's cross-assignment of error alleging that the officers' entry onto his land was an unlawful search. Defendant argues that the trial court ruled correctly on those issues, and he cross-assigns error to the court's ruling that the entry onto his property was lawful.

■ Article I, section 9, of the Oregon Constitution, provides, in part:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

A search occurs when the state intrudes upon an individual's right to privacy. *State v. Wacker*, 317 Or 419, 425, 856 P2d 1029 (1993).

■ Article I, section 9, protects a privacy interest in land outside the curtilage of a person's dwelling, if the person manifests an intent to exclude the public by erecting barriers, such as fences or signs. *State v. Dixson/Digby*, 307 Or 195, 211-12, 766 P2d 1015 (1988). A person also has a privacy interest in the curtilage of the dwelling. *State v. Breshears/ Oliver*, 98 Or App 105, 111, 779 P2d 158 (1989). However, a person impliedly consents to visitors going to the front door of

---

[1] The motion did not specify any particular statement.

the person's house, provided the person has not manifested an intent to forbid the intrusion of casual visitors onto the property. *State v. Ohling*, 70 Or App 249, 688 P2d 1384, *rev den* 298 Or 334 (1984). As explained below, in order to exclude visitors from going to the front door, a person must make a greater showing than that which would be required to exclude individuals who would use the property for their own purposes, such as hiking.

In *State v. Dixson/Digby, supra*, the officers obtained consent from a lumber company to search its land. While walking on the lumber company's land, they encountered a "No Hunting" sign that marked the boundary of defendant's property. They passed the sign, walked onto defendant's property and discovered a marijuana patch. The Supreme Court held that the "No Hunting" sign manifested an intent to exclude only hunters from the property. The court indicated that a "No Trespassing" sign would have adequately manifested an intent to forbid other uses, such as hiking. 307 Or at 212 n 6.

Cases considering the requisite showing of intent to exclude visitors from going to the front door of a house have imposed a more stringent standard than that applied in *Dixson/Digby*. In *State v. McIntyre/Pereira*, 123 Or App 436, 860 P2d 299 (1993), *rev den* 318 Or 351 (1994), we held that a tall wooden fence and a metal gate blocking the driveway did not, by themselves, adequately manifest an intent to exclude visitors from going to the front door. In *State v. Russo*, 68 Or App 760, 683 P2d 163 (1984), on the other hand, the defendants had posted a sign next to a cable that blocked the driveway. The sign instructed visitors that they had reached the front door and that they should honk to gain the attention of a resident, if one was available. The driveway was also marked by "No Trespassing" and "Private Property" signs. On those facts, we held that they had taken adequate measures to exclude visitors from their property.

In this case, the officers did not wander about on defendant's property. They used the driveway to obtain access to the residence, in order to make contact with an occupant. Defendant contends that he manifested an intent to exclude such visitors by posting signs where his driveway departs from the public road and at his property boundary.

■ The officers' failure to see the signs at the beginning of the driveway is relevant to whether their posting by defendant objectively manifested an intent to exclude. In *State v. Collier*, 124 Or App 100, 103, 861 P2d 397 (1993), *rev den* 318 Or 326 (1994), we held that, because the officer "could not see 'no trespassing' signs while making no deliberate effort to avoid seeing them, * * * [the defendant] did not adequately manifest an intention to exclude the public from his property." In this case, the officers did not see the signs near the beginning of defendant's driveway, and there is no contention that they deliberately avoided seeing them. Those signs did not adequately manifest defendant's intent to exclude visitors.

■ We conclude that the "No Trespassing" sign on the boundary fence, alone, was inadequate to exclude visitors who would use the driveway to make contact with the occupants of the house. A reasonable visitor could have assumed that that sign was intended only to exclude those who might put the property to their own uses, but that it did not apply to visitors who desired to contact the residents.[2] In these circumstances, we hold that the officers did not invade any protected zone of privacy by using defendant's driveway to gain access to his house. Therefore, we affirm the trial court's ruling on defendant's cross-assignment of error.

We turn to the state's assignments of error, which challenge the trial court's ruling that Looney's view into the shed was an unlawful search.

■ After the officers parked in front of defendant's house, they observed defendant coming out of the shed that they had just passed. At that point, rather than going to the front door of the house, the officers walked toward defendant as he walked toward them. An officer's right to go to the front door of a house is based on implied consent to allow visitors to take reasonable steps to make contact with the occupant. *State v. Ohling, supra.* When defendant came out of the shed, it was no longer necessary for the officers to proceed to the front door. Their decision to go toward defendant, rather

---

[2] Even if that were not so, defendant's prior statement to Looney that he should "come back any time" could be reasonably understood as an invitation to disregard the sign in the future.

than to the front door, was reasonable in these circumstances.

 When defendant walked past Looney, Looney smelled the distinctive odor of P2P emanating from defendant's body. Looney knew that P2P was a precursor chemical used to manufacture methamphetamine. Looney also observed that defendant was under the influence of that drug. Looney was aware of the tip that defendant and Spikes were manufacturing methamphetamine on the property that day. The caller's description of the property and of Spikes' car was corroborated by Looney's personal knowledge. The presence of Spikes' car on the property, and the odor of a precursor chemical on defendant's body as he emerged from the shed, further corroborated the caller's story.[3]

The state contends that, even assuming that Looney's view into the shed was a search, at that time Looney had probable cause to believe that defendant was manufacturing methamphetamine in the shed. It argues that the risk of explosion inherent in that manufacturing process created an exigent circumstance that justified the search. *See, e.g., State v. Moylett*, 313 Or 540, 548, 836 P2d 1329 (1992).

The trial court rejected that argument. Although it found that the smell of P2P emanating from defendant's body revealed that he "had been in the presence of a manufacturing process for methamphetamine at some time," it held:

> "The testimony did not establish that the smell of P2P would dissipate from a person soon after the person had left the immediate proximity of a working lab. There was not testimony that would establish any likelihood that a person who smelled strongly of P2P would have just been exposed to the manufacturing process as opposed to exposure at some earlier time. * * * [Looney] was not aware of facts, before looking into the building, that would support the conclusion that a lab was *then* working so as to pose a danger to the officers and the surrounding buildings." (Emphasis in original.)

---

[3] There is no contention that the tip must be disregarded. *Cf. State v. Carlile*, 290 Or 161, 619 P2d 1280 (1980) (regarding hearsay information in the determination of probable cause).

The trial court was correct that the exigency created by the risk of explosion exists only if the laboratory is in operation. *State v. Chapman*, 107 Or App 325, 333, 813 P2d 557 (1991). Therefore, the state was required to show that Looney had probable cause to believe that the laboratory was then operating in the shed. We disagree with the trial court that the state's failure to prove that the odor of P2P dissipates rapidly is fatal to that showing. The fact that defendant came out of his shed smelling of a precursor chemical used to manufacture methamphetamine substantially contributed to Looney's probable cause to believe that there was an operating methamphetamine laboratory in defendant's shed.

In the view of all of the circumstances after defendant walked past Looney, we conclude that at that time Looney had probable cause to believe that there was an operating methamphetamine lab in defendant's shed. We also conclude that the danger of an explosion that could injure the officers, defendant, or the residents of the nearby house created an exigency that justified Looney's immediate search of the shed. Although Looney's view into the shed through the cracks in the siding was a search, that search was justified by probable cause to search and by exigent circumstances.

The trial court erred in ruling that the search of the shed was unlawful. The court's order suppressing the other evidence was predicated on that evidence being the fruit of an unlawful search of the shed. Because the search of the shed was lawful, that predicate is absent. Defendant makes no contention that the evidence should be suppressed on other grounds not already discussed.

Reversed and remanded.