Argued and submitted March 30, reversed and remanded for new trial May 24, 1995

# STATE OF OREGON,
*Respondent,*

*v.*

# ANDREW ARTHUR PORTREY,
*Appellant.*

(93-1450; CA A83622)

896 P2d 7

Steven V. Humber, Deputy Public Defender, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender.

Caroline Carey, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R.

Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

Defendant appeals from convictions for burglary in the second degree, ORS 164.215, theft in the first degree, ORS 164.055, theft in the second degree, ORS 164.045, and criminal mischief in the first degree, ORS 164.365. He assigns as error the trial court's denial of his motion to suppress evidence seized pursuant to a search warrant. He argues that, because the determinative information in the affidavit offered in support of the application for the warrant was obtained through an illegal search, the affidavit did not establish probable cause to search his residence. We reverse.

On the night of December 20, 1993, the dental offices of two Astoria dentists were burglarized. The offices were ransacked, a safe was broken into, currency and coins were stolen, and holes were broken through two interior walls. The officers called to the scene noticed shoe prints on the carpet where someone with sheetrock dust or plaster of paris on their shoes had stepped. One of the officers suspected that defendant may have been involved in the burglary, and he and another officer went to defendant's apartment to question defendant. Upon arriving at the apartment, they encountered defendant and his roommate, Palek, who talked with them at the front door. Both had been drinking alcoholic beverages in violation of the terms of their respective probations. The officers observed white objects on defendant's shoulders, which they believed were sheetrock particles. When the officers questioned defendant about the particles, defendant said that he did not know what they were or where they had come from. While he was there, one of the officers noticed a pair of boots on top of a box on the front porch.

The officers left defendant's apartment and contacted the probation officers for defendant and Palek. They informed the probation officers that defendant and Palek had been consuming alcoholic beverages. Palek's probation officer asked the officers to meet both probation officers at defendant's residence to assist in arresting Palek. The officers returned to defendant's apartment where they met the probation officers, and the four of them went to defendant's door. One of the officers knocked, but no one answered. While they waited for someone to come to the door, one of the officers looked again at the pair of boots that he had seen

during the earlier visit. The officer testified that the boots had a "white chalky * * * substance on top of them and * * * it looked like sheetrock." The officer noted that the other contents of the box were wet, but that the boots were dry. He picked up the boots, looked at the soles, and determined that the soles matched the shoe prints he had seen at the dental offices. He then seized the boots as evidence, left the apartment premises, and applied for a telephonic search warrant to search defendant's apartment. ORS 133.545(5). During his sworn statement to the issuing magistrate,[1] the officer told the magistrate that the soles of the boots matched the footprints found inside the dentist's office.

Defendant argues that the affidavit offered in support of the application for the search warrant does not establish probable cause, because the information regarding the boots' match to the shoe prints was obtained pursuant to an illegal search in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. He contends that, even though the boots were in plain view on the front porch, they were not lawfully seizable unless the officers had probable cause to believe that they were evidence of a crime. At trial, under cross-examination, the officer who had picked up the boots admitted that he did not feel he had probable cause to obtain a search warrant until after he had picked up the boots and examined the soles. Accordingly, defendant argues that the boots were seized and searched before there was probable cause to believe that they were evidence of a crime.[2]

We begin by determining whether the officer invaded an interest protected by Article I, section 9.[3] *See State v.*

---

[1] A sworn statement made pursuant to ORS 133.545(5) is considered to be an affidavit for purposes of obtaining a search warrant.

[2]

"Probable cause under the Oregon Constitution has both a subjective and an objective component. An officer must subjectively believe that a crime has been committed and thus that a person or thing is subject to seizure, and this belief must be objectively reasonable in the circumstances." *State v. Owens*, 302 Or 196, 204, 729 P2d 524 (1986).

[3] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation,

*Kennedy*, 295 Or 260, 262-65, 666 P2d 1316 (1983) (holding that state constitutional issues are to be decided before federal constitutional issues). The state argues, and the trial court agreed, that the front porch of defendant's apartment was not a constitutionally protected area and, therefore, defendant had no privacy interest in his front porch or in the boots left on the porch. The Oregon Supreme Court has said:

> "Unlike under the federal constitution, a search [under Article I, section 9,] is not defined by a reasonable expectation of privacy, but in terms of 'the privacy to which one has a *right.*' " *State v. Nagel*, 320 Or 24, 29, 880 P2d 451 (1994) (quoting *State v. Campbell*, 306 Or 157, 164, 759 P2d 1040 (1988)). (Emphasis in *Campbell*.)

That right includes protection against practices by the government that "significantly impair 'the people's' freedom from scrutiny." *Campbell*, 306 Or at 171. One indication of whether a government action intrudes on a person's privacy right is whether a private individual would offend social and legal norms of behavior by engaging in the same kind of intrusion.[4]

■     We held in *State v. Breshears/Oliver*, 98 Or App 105, 111, 779 P2d 158 (1989), that an apartment dweller has a privacy interest in the area surrounding his or her residence. Certainly, that includes the immediate area surrounding the dweller's front door. Nevertheless, the law assumes that, absent evidence of an intent to exclude, an occupant impliedly consents to people walking to the front door and knocking on it, because of social and legal norms of behavior. In *State v. Ohling*, 70 Or App 249, 253, 688 P2d 1384 (1984), we explained:

> "Going to the front door and knocking [is] not a trespass. Drivers who run out of gas, Girl Scouts selling cookies, and political candidates all go to the front doors of residences on a more or less regular basis. Doing so is so common in this society that, unless there are posted warnings, a fence, a

---

and particularly describing the place to be searched, and the person or thing to be seized."

[4] As the court explained in *State v. Campbell*, 306 Or 157, 171, 759 P2d 1040 (1988), it is the scope of the constitutional provision that "plays a substantial role in shaping [social and legal] norms."

moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion.''

Here, the officers, like any other person, were at liberty to observe all objects and activities from that vantage point at the front door. *See State v. Ainsworth*, 310 Or 613, 621, 801 P2d 749 (1990). Thus, no interest protected by the constitution was violated by the observation of the boots left on the box on the front porch. If that observation had led to probable cause to seize the boots, then the subsequent seizure would be permissible. The state does not make that argument here.

The issue, then, is whether the officers violated the constitution by picking up the boots and examining them in the absence of probable cause. The state argues that defendant had no privacy interest in the boots, because he either left them on the front porch, where defendant maintained no privacy interest, or abandoned them. However, our prior interpretation of section 9 does not support that argument. In *State v. Gabbard*, 129 Or App 122, 128, 877 P2d 1217 (1994), we explained that

"[a]n officer's right to go to the front door of a house is based on implied consent to allow visitors to take reasonable steps to make contact with the occupant.''

Thus, the intrusion to which an occupant impliedly consents is limited. One may expect that visitors will stand on the front porch for the purpose of engaging in conversation, but that does not mean that it is expected that visitors will pick up items on the front porch and examine what is not in view. By impliedly consenting to one form of intrusion, an occupant does not necessarily consent to being subjected to other forms of scrutiny as well. *See State v. Binner*, 131 Or App 677, 886 P2d 1056 (1994).

In this case, defendant's privacy interest continued in the articles on his front porch that were not entirely visible to someone standing there, even though he had impliedly consented to visitors coming to his front door. The officers' actions intruded on a privacy interest defendant maintained in the area around his front door to which defendant had not impliedly or expressly consented. Furthermore, this is not a

case in which the evidence in question shows that the boots had been abandoned by their owner. It is clear from their position on the front porch that the boots were the personal property of someone, and that by picking them up, the officers engaged in activity that exposed a concealed portion of the boots to their view.

That action by police regarding concealed personal effects implicates constitutional guarantees. The facts in *State v. Gilbert*, 276 Or 801, 556 P2d 651 (1976), are somewhat analogous to the facts in this case. In *Gilbert*, the officers had authorization pursuant to a search warrant to seize specific items in a lakeside cabin. In the course of their search, they discovered an outboard motor in a closet. The motor was not an item included in the search warrant, but one of the officers suspected that the motor was stolen property. Based on that suspicion, the officers removed the cover plate from the motor, saw that the serial number had been obliterated and seized the motor as evidence. The court held that the trial court correctly suppressed the evidence of the motor's obliterated serial number. *Id.* at 803. Similarly, the officers in this case, like the officers in *Gilbert*, were authorized to make a limited intrusion into an area that was otherwise protected under section 9. However, by picking the boots up and examining a portion of them that had been concealed, the officers exceeded the implied consent of the occupant.[5] Because the officers' actions in picking up and examining the boots constituted an illegal search under Article I, section 9, the information gained from that examination was subject to suppression and should have been excised from the search warrant affidavit. The trial court erred in denying defendant's motion to suppress.

Reversed and remanded for new trial.

---

[5] Subsequent Oregon Supreme Court cases have explained that what makes such actions by the officers a search is the fact that the officers' conduct allows them to observe what they could not have otherwise observed from a lawful vantage point. *State v. Rhodes*, 315 Or 191, 197, 843 P2d 927 (1992); *State v. Nagel*, 320 Or 24, 31, 880 P2d 451 (1994). For example, in *Rhodes*, the Oregon Supreme Court held that an officer's complete opening of a car door that was already open three to four inches constituted a search, because the physical grasping of the vehicle door and moving it a few inches exposed the inside to a visual inspection "that could not have been made without opening the door." 315 Or at 197.