Argued and submitted April 30, reversed and remanded for new trial
December 26, 2001

STATE OF OREGON,
*Respondent,*

*v.*

MATTHEW SHANE FORTMEYER,
*Appellant.*

C98-07-36224; A105233 (Control)

STATE OF OREGON,
*Respondent,*

*v.*

WENDI KATHRYN PALMER,
*Appellant.*

C98-07-36223; A105260
(Cases Consolidated)

37 P3d 223

Peter Gartlan, Deputy Public Defender, argued the cause for appellants. With him on the brief was David E. Groom, Public Defender.

Laura S. Anderson, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Wollheim, Judge, and Ceniceros, Senior Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

In this consolidated appeal, defendant Fortmeyer appeals from a judgment of conviction for manufacture and possession of a controlled substance, and defendant Palmer appeals from a judgment of conviction for possession of a controlled substance. ORS 475.992. Defendants assign error to the trial court's denial of their motion to suppress evidence obtained pursuant to a search warrant. Defendants argue that the information used in the search warrant affidavit was obtained in the course of an illegal search, in violation of Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution.[1] We review for errors of law, deferring to the trial court's findings of fact if there is sufficient evidence in the record to support those findings. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We reverse and remand.

Officers Shropshire and McCartney received information that Fortmeyer and Palmer might be growing marijuana and went to defendants' residence to perform a "knock and talk," where they spoke with Fortmeyer. The officers asked for consent to search the residence, and Fortmeyer refused. The officers went to the next-door neighbor's residence and obtained consent to enter a three- to four-foot wide common area adjacent to defendants' residence. The officers were walking along the common area when McCartney noticed a basement window behind a door panel that had been leaned up against defendants' house. McCartney saw a "little light from a crack in the window." The window was at ground level and was about 18 inches in height. It was partially blocked on the outside by the door panel, which was leaning against the wall at an angle. Except for a two-by-six inch crack at the top of the window, it was covered on the inside by a piece of cardboard.[2] The officers testified that, by kneeling down at a particular angle and turning their heads toward the basement window, they could see around the door

---

[1] Because we resolve this case on state constitutional grounds, we do not consider the federal constitution. *State v. Kennedy*, 295 Or 260, 262-65, 666 P2d 1316 (1983).

[2] Fortmeyer testified that the purpose of the door panel and the cardboard was to prevent neighbors from looking in the basement window.

panel and through the two-by-six inch crack. From that position, the officers saw an open doorway on the far wall of the main basement room. Through that doorway, the officers saw what appeared to be marijuana plants. Based on that information, the officers arrested defendants, obtained a search warrant, and seized the marijuana plants.

At trial, defendants filed a motion to suppress and controvert, arguing that the officers' looking through the crack in the window constituted an illegal search. The trial court disagreed and denied defendants' motion. Subsequently, defendants were both found guilty of possession of a controlled substance, and Fortmeyer was also found guilty of manufacture of a controlled substance.

On appeal, defendants argue that they communicated their desire for privacy by erecting barriers and that the officers recognized, but intentionally circumvented, those barriers when they made special efforts to position themselves to look into the basement. Their special efforts, defendants argue, constituted a search and violated defendants' right to privacy. The state argues that the officers' actions did not constitute a search because they were at a lawful vantage point and defendants' activities were plainly visible without any "special effort."

■■■ Defendants' argument turns on whether the officers invaded a privacy interest protected by Article I, section 9, of the Oregon Constitution,[3] against unreasonable searches and seizures. *State v. Campbell*, 306 Or 157, 163, 759 P2d 1040 (1988). "[T]he privacy protected by Article I, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right*." *Id.* at 164 (emphasis in original). That privacy right is particularly pertinent when it involves a person's home. *See generally State v. Tanner*, 304 Or 312, 320, 745 P2d 757 (1987). That is so because a person's home is the "quintessential domain protected by the constitutional guarantee against warrantless searches." *State v. Louis*, 296 Or 57, 60, 672 P2d 708 (1983). The privacy rights protected by Article I, section 9, are defined by an objective test of whether

---

[3] Article I, section 9, of the Oregon Constitution, provides that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."

the government's conduct "would significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his privacy." *State v. Dixson/Digby*, 307 Or 195, 211, 766 P2d 1015 (1988). "[T]he threshold question in any Article I, section 9, search analysis is whether the police conduct at issue is sufficiently intrusive to be classified as a search." *State v. Ainsworth*, 310 Or 613, 616, 801 P2d 749 (1990) (citing *Campbell*, 306 Or at 162-63). "One indication of whether a government action intrudes on a person's privacy right is whether a private individual would offend social and legal norms of behavior by engaging in the same kind of intrusion." *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995). However, people may sacrifice their right to privacy by conducting themselves "in otherwise protected areas in such a way that their words or acts can plainly be seen or heard outside without any special effort." *Louis*, 296 Or at 61. *See, e.g., State v. Wacker*, 317 Or 419, 426-27, 856 P2d 1029 (1993) (defendant, who carried out activities in a lighted car in the parking lot of a business open to the public where people regularly passed within a few feet of the car, had no protected privacy interest that was violated when police watched the activities).

The trial court found that the facts in *State v. Corra*, 88 Or App 339, 745 P2d 786 (1987), *rev den* 305 Or 331 (1988), were most analogous to the facts presented here and held that defendants' activities were plainly visible without any special effort. We disagree with the trial court's analysis and find our decisions in *State v. Gabbard*, 129 Or App 122, 877 P2d 1217, *rev den* 320 Or 131 (1994), and *Portrey*, 134 Or App at 464, to be more on point.

In *Corra*, a police officer stood on a rock on neighboring property to look over a six-foot fence into the defendant's yard, where he observed marijuana growing. On appeal, the defendant argued that the marijuana evidence should be suppressed because the officer's actions constituted a warrantless search. We rejected the defendant's claim and held, on the basis of *Louis*, that the defendant had sacrificed his privacy interest by conducting himself in such a manner that "he could not insist that others ignore that which was available to their senses." *Corra*, 88 Or App at 342; *see Louis*, 296 Or at 61 (officer's telephotographing from neighbor's garage what could otherwise be seen by the public was not a search

because defendant forfeited his right to privacy by exposing himself in his living room window on a regular basis). We based our holding in *Corra* on the fact that many people could have seen over the fence without standing on the rock. 88 Or App at 342. However, we acknowledged that Article I, section 9, restricts the ability of officers to peer over fences. *Id.* Therefore, the officer could not climb to whatever height necessary to see over the fence. *Id.* We also noted that "[t]here may be a difference between looking over a fence which everyone knows is too short to preclude all observation and using chinks and cracks to peek through a fence, which appears to be otherwise adequate to prevent such snooping." *Id.* at 342 n 1; *also see Louis*, 296 Or at 61 ("A determined official effort to see or hear what is not plain to a less determined observer may become an official 'search.'").

■■ Cases such as *Corra, Louis,* and *Wacker* are materially distinguishable from this case. Here, defendants did not sacrifice their right to privacy because they did not conduct their activities so that they plainly could be seen by passersby. To the contrary, defendants took extra measures to try to protect their privacy in their home. Defendants used cardboard to obscure a ground-level basement window that faced a three- to four-foot wide common area shared with a neighbor. They also propped up a door panel against the outside wall to further block access to the window. Further, defendant Fortmeyer refused to give the officers consent to search. Defendants' efforts announced their interest in privacy. They did not lose their privacy interest in their home, and their activities did not become plainly visible, simply because a two-by-six inch crack in an otherwise obstructed window was visible from a particular angle by officers who crouched down and peered behind the door. There is a distinct difference between the defendants' conduct in *Corra, Louis,* and *Wacker* and that of defendants in this case. Accordingly, we reject the state's contention that defendants' activities were plainly visible without any special effort.

*Gabbard*, 129 Or App at 130, is similar to this case. In *Gabbard*, police received an anonymous tip that the defendant was manufacturing methamphetamine at his property. Two detectives went to investigate the property and parked their vehicle between the defendant's house and a shed. As

the detectives got out of their vehicle, the defendant emerged from the shed and approached the detectives. One of the detectives recognized an odor that is related to manufacturing methamphetamine. The detective, who was six feet tall, approached the shed and bent down to look through a crack in the siding about four and one-half feet above the ground. We held that, even though the detectives were lawfully on the property, "[the detective's] view into the shed through the cracks in the siding was a search," although it was justified by probable cause and exigent circumstances. *Id.*

■■■ Here, although the officers had obtained permission to enter the shared common area, that did not give the police a right to kneel down at a particular angle and peer through cracks in defendants' otherwise obstructed basement window. The officers' actions constituted a search, and the only thing that distinguishes this case from *Gabbard* is that the officers in this case had neither probable cause nor exigent circumstances.

Further, similar conduct engaged in by private individuals would offend both social and legal norms. In *Portrey*, 134 Or App at 465, police officers went to the defendant's house to question him about a burglary. While waiting for someone to answer the front door, one of the officers noticed a pair of boots on the porch that he suspected may have been worn during the burglary. The officer picked up the boots to examine the soles, confirming that the soles matched shoe prints at the scene of the burglary. We held that that was a search that intruded on the defendant's privacy interests. *Id.* Even though the defendant "impliedly consent[ed] to persons coming to the front door and knocking on it, because of social and legal norms of behavior," the "defendant's privacy interest continued in the articles on his front porch that were not entirely visible to someone standing there." *Id.* at 464-65.

While the officers in this case had obtained a lawful vantage point, defendants still retained a privacy interest in items in the common area and within the house that were not entirely visible to someone standing there. The officers testified that, to see the room with the marijuana in it, they had to kneel down at a particular angle and turn their heads

towards the crack in the otherwise obstructed basement window. To find strangers, on their knees, attempting to peer through what appears to be a covered basement window, would be suspicious, uncommon, and unacceptable in our society. *See id.* (whether police engage in a search by examining items not "entirely visible" depends, in part, on "social and legal norms of behavior"); *State v. Larson*, 159 Or App 34, 41, 977 P2d 1175, *rev den* 329 Or 318 (1999) ("The presence of an individual, other than a resident or guest, in the back area of an apartment building, peering up at the second-floor windows, would offend social and legal norms of behavior."). Accordingly, permitting the government to engage in such conduct—particularly where an individual has taken extra, albeit imperfect, measures to ensure his or her privacy—would significantly impair an individual's interest in freedom from scrutiny. Therefore, we conclude that the officers' conduct constituted a search of defendants' home under Article I, section 9, of the Oregon Constitution. Furthermore, because the search was warrantless and not justified under an exception to the warrant requirement, it was unreasonable and violated Article I, section 9. The trial court erred in denying defendants' motion to suppress.

Reversed and remanded for new trial.