Argued and submitted May 16, 2013, reversed and remanded April 16, petition for review allowed August 7, 2014 (355 Or 879)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

AMANDA L. NEWCOMB,
*Defendant-Appellant.*

Multnomah County Circuit Court
110443303; A149495

324 P3d 557

Andrew D. Robinson, Deputy Public Defender, argued the cause for appellant. With him on the brief was

Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jamie K. Contreras, Assistant Attorney-in-Charge, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Defendant appeals her conviction for second-degree animal neglect, arguing that the trial court erred in denying her motion to suppress evidence obtained when an animal control officer seized her dog and a veterinarian then subjected the dog to testing. Defendant contends that the trial court erred in concluding that the officer's seizure of the dog was justified under the "plain view" exception to the warrant requirement. Defendant further argues that, even if the officer lawfully seized the dog, the trial court erred in concluding that the veterinarian did not "search" the dog because the veterinarian's actions—sampling and testing the dog's blood and feces and recording the dog's weight over several days—revealed information that otherwise would have been hidden or concealed and, therefore, violated defendant's protected privacy interests. The state responds that the dog was lawfully seized and, with respect to the veterinarian's actions, that defendant had no protected privacy interest in the dog's "body condition" because, unlike other property, the dog had a right to care and to be free of neglect, and those rights "trump[ed]" defendant's constitutional possessory and privacy rights.

We conclude that the officer lawfully seized the dog under the "plain view" exception to the warrant requirement because his observations of the dog while lawfully in defendant's apartment, together with information he received from defendant and a named informant, provided probable cause to believe that defendant had neglected the dog and the dog was evidence of that neglect. As to whether the veterinarian's actions invaded defendant's protected privacy interests, we reject the state's novel claim that an animal's statutory rights "trump" a defendant's constitutional rights. Under the prevailing principles of Article I, section 9, of the Oregon Constitution governing privacy rights with respect to personal effects, we conclude that the extraction and testing of the dog's blood was a "search," because those actions constitute a physical invasion of defendant's personal property that revealed otherwise concealed evidence. Accordingly, we reverse and remand.

We describe the facts consistently with the trial court's explicit and implicit findings, which the evidence supports. A named informant reported to the Oregon Humane Society that defendant's "dog was being housed in a kennel for many hours of the day, it was being beaten by * * * defendant, and also wasn't being fed properly." An officer, working as an animal cruelty investigator, went to defendant's apartment to investigate the complaint. The officer entered the apartment with defendant's consent and saw the dog in the yard behind the home. The officer saw that the dog was "in a near-emaciated condition" and "was kind of eating at random things in the yard, and * * * try[ing] to vomit. Nothing was coming up, but [the dog] was trying to vomit." The officer asked defendant why the dog was in that condition; defendant told him that she was out of dog food but was going to get more food that night.

The officer concluded that the dog "certainly appeared neglected" and there was a "strong possibility" that the dog needed medical care. He wanted to take the dog into custody and have it tested by a veterinarian "in order to make a determination if [he] was going to pursue this criminally" and to "determine what [was] wrong with [the dog], to get him vet care." The officer asked defendant to sign a temporary medical release; she refused. The officer then took custody of the dog and brought it to the Humane Society.

At the Humane Society, a veterinarian took samples of the dog's blood and feces and tested those samples. The veterinarian also fed the dog, weighed the dog every three to four days, and charted the change in weight over time.[1] According to the officer, those tests, taken together, showed that defendant's dog "was a healthy dog and with a basic plan of good quality food, he rapidly began to gain weight. So there basically was nothing wrong with him."

---

[1] In the trial court, defendant described the veterinary tests in a memorandum in support of her motion to suppress. At the suppression hearing, the prosecutor told the court that, "with respect to the vet, I spoke with counsel about this beforehand. We are in agreement as to what the evidence is and I'm not going to be bringing the vet in for the motion, but just the result of the tests, not much more detail than that[.]" The trial court and the parties discussed whether the tests, as defendant had described them, constituted a search. On appeal, then, the parties rely on the limited description of the tests in defendant's memorandum.

Thus, the evidence was relevant to show that the dog's "near-emaciated" condition resulted from neglect—lack of feeding—rather than sickness or disease.

Defendant filed a motion to suppress evidence derived from the warrantless seizure and search of her dog under Article I, section 9, and the Fourth Amendment to the United States Constitution.[2] Defendant argued that dogs are personal property and that Article I, section 9, and the Fourth Amendment protected her possessory interest in her dog. Defendant also asserted that she had a privacy interest in her dog, and that the state and federal constitutions protected that interest "with the same force [they] protect[] the right to privacy in personal items such as boots and pocket knives."

As to the warrantless seizure of the dog, defendant argued that the "plain view" exception to the warrant requirement did not apply because the officer lacked probable cause to believe that the dog was evidence of a crime. Specifically, defendant argued that, "at the time [the officer] seized the dog, he did not have probable cause to believe that the reason it was skinny was because of some failure on [defendant's] part." As a result, defendant argued, all "derivative evidence" of the warrantless seizure should be suppressed.

Further, defendant argued that, even if the seizure were lawful, she "maintained a protected privacy interest [under Article I, section 9,] in information about her dog not otherwise exposed to public view." Thus, in defendant's view, the "battery of laboratory tests on [the] dog's blood, fecal matter, feeding habits, and pattern of weight gain *** [were] searches under Article I, Section 9 because the tests invade[d] [her] privacy interest in her dog by revealing information not otherwise exposed to public view." (Internal quotation marks omitted.) Defendant asserted that the test results "reveal[ed] all these intimate details about the dog's body chemistry, about its blood levels, about its feeding habits, all of these things were information that was

---

[2] Article I, section 9, provides, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" The Fourth Amendment to the United States Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

not otherwise exposed to public view." Ultimately, she contended that, assuming that the seizure of the dog was lawful, all evidence derived from the veterinarian's warrantless searches of the dog—the test results on the blood and feces and the records of the dog's weight—should be suppressed.

The state responded that the seizure of the dog was justified under the plain view exception to the warrant requirement. The state argued that the officer, having seen the dog in an emaciated state while lawfully in defendant's apartment, had probable cause to believe the dog had been neglected "based on his conversation with [defendant] about [how] she was apparently out of dog food and the citizen report at the outset." As to the veterinarian's actions once the dog was seized, the state responded that a dog "is one thing itself" and "doesn't contain anything else other than more dog." With respect to the testing, the state argued that "[s]imply doing testing on an object to confirm it is what law enforcement believes it is, is well recognized to not require a warrant or a separate justification for it." The state further argued that the state and federal constitutions only prohibit "unreasonable" searches and seizures, and it is reasonable for a veterinarian "to provide medical care to a dog to determine what's wrong with it, to feed a dog, to do all of that."

The trial court denied defendant's suppression motion. The trial court concluded that defendant consented to the officer entering her residence, and the warrantless seizure of the dog was lawful because the officer had probable cause to believe that defendant had neglected the dog. The trial court determined that the veterinarian's actions— sampling and testing the blood and feces and recording the dog's weight—did not constitute a "search" under Article I, section 9, or the Fourth Amendment. After the court denied defendant's suppression motion, a jury found defendant guilty of animal neglect in the second degree, ORS 167.325(1),[3] and the trial court sentenced defendant to one year of bench probation.

---

[3] Under ORS 167.325(1)(a), "[a] person commits the crime of animal neglect in the second degree if, except as otherwise authorized by law, the person intentionally, knowingly, recklessly or with criminal negligence * * * [f]ails to provide minimum care for an animal in such person's custody or control[.]" "'Minimum care' means care sufficient to preserve the health and well-being of an animal"

On appeal, defendant reprises the arguments she made in the trial court under Article I, section 9, and the Fourth Amendment, challenging the warrantless seizure of the dog and arguing that the subsequent sampling and testing of the dog's blood and feces, as well as the recording of the dog's weight over several days, were warrantless searches. The state responds that there was no violation of either Article I, section 9, or the Fourth Amendment because the seizure was justified under the plain view exception to the warrant requirement, and the veterinarian did not conduct a search when she examined the dog. We review for errors of law. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

We begin with the officer's warrantless seizure of the dog under Article I, section 9. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court disposes of state constitutional claims before addressing federal constitutional claims). The parties agree that, when the officer removed defendant's dog from her home, he seized her personal property.[4] In other words, defendant had a possessory interest in the dog just as she did with other "effects," and the officer invaded that possessory interest. *See State v. Owens*, 302 Or 196, 207, 729 P2d 524 (1986) ("A 'seizure' occurs when there is a significant interference with a person's possessory or ownership interests in property."). Warrantless searches and seizures are *per se* unreasonable under Article I, section 9, unless they fall within "one of the few specifically established and well-delineated exceptions to the warrant requirement." *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (internal quotation marks omitted). The state has the

and requires "[f]ood of sufficient quantity and quality to allow for normal growth or maintenance of body weight." ORS 167.310(9).

[4] The criminal animal abuse and neglect statutes recognize that dogs and other animals may be the "property" of an "owner." *See* ORS 167.310(9) ("'Minimum care' means care sufficient to preserve the health and well-being of an animal and, except for emergencies or circumstances beyond the reasonable control *of the owner*, includes [specific requirements.]" (Emphasis added.)); ORS 167.340(1) ("A person commits the crime of animal abandonment if the person *** leaves a domestic animal *** at a location without providing minimum care."); ORS 167.310(4), (12) (stating that "'[d]omestic animal' means an animal, other than livestock or equines, *that is owned or possessed by a person*" and that "'[p]ossess' has the meaning provided in ORS 161.015" (emphasis added)); ORS 161.015(9) ("'Possess' means to have physical possession or otherwise to exercise dominion or control *over property*." (Emphasis added.)); *see also* ORS 609.020 ("Dogs are *** declared to be personal property.").

burden of demonstrating that the seizure was justified by an exception to the warrant requirement. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991).

As pertinent here, the "plain view" exception to the warrant requirement allows an officer to seize an object without a warrant if the officer encounters the object in plain view, while in a place where the officer is entitled to be, and the incriminating character of that object is immediately apparent. *State v. Currin*, 258 Or App 715, 718-19, 311 P3d 903 (2013); *State v. Sargent*, 323 Or 455, 463 n 5, 918 P2d 819 (1996) (stating that "the intrusion must be valid and it must be immediately apparent that the items [seized] are crime evidence"). In this case, there is no dispute that, because defendant gave consent to the officer to enter her apartment, the officer observed the dog in plain view while in a place where he was entitled to be. *See, e.g., State v. Ford*, 220 Or App 247, 252, 185 P3d 550 (2008) (concluding that, after the defendant consented to an officer's search of a dresser drawer, the officer could seize methamphetamine pipe that officer observed in the drawer).

The question here is whether the incriminating nature of the evidence was immediately apparent, that is, whether the police, upon seeing the dog, "had probable cause to believe that [it] was either contraband or evidence of a crime." *State v. Carter*, 342 Or 39, 45, 147 P3d 1151 (2006) (so stating, in the context of evidence discovered during execution of a search warrant). That standard is met, under Article I, section 9, when the police "subjectively believe that a crime has been committed and thus that a person or thing is subject to seizure" and that belief is "objectively reasonable in the circumstances." *Owens*, 302 Or at 204.

Defendant contends that, when the officer saw the dog, it was not "immediately apparent" to him that the dog had been neglected—in this case, not given enough food to maintain a healthy body weight—because "the officer could not determine for purposes of criminal prosecution whether the dog's condition was the result of criminal neglect or some other cause without having it tested by a veterinarian." In response, the state acknowledges that the officer "could not say with certainty that [the dog's] condition was caused by

neglect without first ruling out medical explanations," but argues that the officer nonetheless had probable cause to believe that defendant had neglected the dog based on the totality of the circumstances.

We agree with the state. The officer saw the dog, in a near-emaciated condition, eating at random things in the yard and then attempting to vomit. Based on those observations, the officer thought that the dog "certainly appeared neglected" and that there was a "strong possibility" that the dog needed medical treatment. Although the dog's physical appearance might have been consistent with either neglect or illness, the officer had more to go on than the dog's emaciated appearance: The officer knew that a named informant had called the Humane Society to complain that defendant was not properly feeding her dog, and, when the officer asked defendant if she had any dog food, she admitted that she had run out of dog food. Those facts, taken together with the dog's appearance, support a reasonable belief that the dog was emaciated because defendant had failed to provide enough food for the dog to maintain a normal body weight, and, therefore, that the dog was evidence of a crime. *See, e.g., State v. Herbert,* 302 Or 237, 242, 729 P2d 547 (1986) (concluding that police had probable cause to believe that an opaque paperfold contained contraband based on the paperfold's appearance and shape along with "additional facts," such as the defendant's attempt "to distract the officer while [he] furtively removed the paperfold from his pocket"). That was all that was required for probable cause, even if more would be required to meet the standard for a conviction. *See, e.g., State v. Goodman,* 328 Or 318, 326, 975 P2d 458 (1999) ("Probable cause is not certainty; 'there is a vast difference between proof of probable cause and proof of guilt * * *.'" (quoting *State v. Tacker,* 241 Or 597, 601, 407 P2d 851 (1965))). Accordingly, the trial court did not err in concluding that the officer's seizure of the dog was justified by the "plain view" exception to the warrant requirement under Article I, section 9.[5]

---

[5] The same is true regarding the plain view exception to the warrant requirement under the Fourth Amendment. *See, e.g., Horton v. California,* 496 US 128, 136-37, 110 S Ct 2301, 110 L Ed 2d 112 (1990) (explaining that a valid plain view seizure requires that (1) the officer not have violated the Fourth Amendment in

We turn to the question of whether the veterinarian conducted a "search" of the dog under Article I, section 9, when she sampled and tested the dog's blood and feces and charted the dog's weight over several days.[6] "Under Article I, section 9, a 'search' occurs when a government agent invades a protected privacy interest." *State v. Meredith*, 337 Or 299, 303, 96 P3d 342 (2004). A protected privacy interest "is not the privacy that one reasonably *expects* but the privacy to which one has a *right*." *State v. Campbell*, 306 Or 157, 164, 759 P2d 1040 (1988) (citation omitted; emphasis in original). We determine whether the government invaded a person's protected privacy interest by applying "an objective test of whether the government's conduct 'would significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his privacy.'" *State v. Wacker*, 317 Or 419, 425, 856 P2d 1029 (1993) (quoting *State v. Dixson/Digby*, 307 Or 195, 211, 766 P2d 1015 (1988)).

Defendant contends that she had "an interest in the privacy of the concealed information about her dog" and that she retained that privacy interest even though the officer had seized the dog. According to defendant, the veterinarian's actions invaded her privacy interest by revealing that, "aside from being malnourished, the dog was healthy"—information that was evidence of a crime because it "tend[ed] to show that the dog's emaciation was the result of defendant's neglect." Specifically, defendant contends that the veterinarian conducted a "search" by "sampling" the dog's blood and feces, which defendant describes as requiring the "physical removal of material," and by "testing" that material. Defendant further argues that weighing the dog and charting the dog's weight gain over time was a search because it "prompt[ed] the dog's body to reveal information that would otherwise have remained concealed."

The state responds with a categorical argument. The state starts with the premise that, "although [animals] are property in the eyes of the law, they have a statutory right to

arriving at the vantage point from which he could observe the evidence in plain view; (2) the incriminating character of the evidence be "immediately apparent"; and (3) the officer have "a lawful right of access to the object itself").

[6] The state concedes that the veterinarian working at the Humane Society was a state actor because she was acting at the direction of the officer.

basic care separate and apart from their owners' possessory interests." The state points to the state statutes criminalizing animal mistreatment and to this court's determination that each animal identified in a count of animal neglect is a "victim" of that crime for purposes of ORS 161.067(2), which provides that, when a person's repeated violation of a statute "involves two or more victims, there are as many separately punishable offenses as there are victims." *See State v. Nix*, 251 Or App 449, 461, 283 P3d 442 (2012), *rev allowed*, 353 Or 410 (2013). Ultimately, the state argues that, "[w]here the property rights of an animal owner conflict with the animal's right to be free from abuse and neglect, the animal's rights as a crime victim trump[.]"

We start with the state's argument, which is wholly separate from the privacy rights framework relied upon by defendant. Although the state's argument is broadly worded, we understand the state to contend that, when police lawfully seize an animal, the owner's privacy rights must yield to the animal's right to care, such that government actions consistent with veterinary treatment do not invade defendant's privacy rights.[7] We cannot endorse that view. It is true, as the state maintains, that the legislature has criminalized the mistreatment of animals and, as a result, animals have statutory protections against abuse

---

[7] In support of its argument, the state asserts that the veterinarian "was motivated by a need to diagnose [the dog] and meet [the dog's] medical needs, not to gather information to use against defendant" and that the veterinarian "acted well within her authority in providing that treatment." At the suppression hearing, the parties did not focus on the motivations of the officer who seized the dog (or the veterinarian who did not testify until later at trial), and the trial court made no findings in that regard. The officer's testimony at the suppression hearing suggests that the tests served a dual purpose—to gather evidence and to give medical treatment to the dog. The tests showed that the dog did not have a particular disease or infirmity, meaning that the dog was healthy apart from not being given adequate food. The tests were therefore helpful, as the officer put it, "to make a determination if [he] was going to purse this criminally." But the tests also served as a tool for diagnosis in the course of treatment; in the words of the officer, those tests would "determine what [was] wrong with [the dog.]" In any event, we need not pinpoint the purpose or motivation for the testing because the state argues that there was no search "even if this court were to agree with defendant that the tests were run for purposes of gathering evidence of the crime of neglect." We therefore understand the state to argue that all that matters in weighing defendant's rights against the animal's statutory right to care is that the particular tests are consistent with the provision of veterinary care, even if they are also performed for the purpose of gathering evidence of a crime.

and neglect. But it is also true that many animals, including the dog in this case, are the personal property of their owners. And although the animal abuse and neglect statutes impose certain limits on what owners can do with their property, those statutes do not—and cannot—by themselves justify a government actor's intrusion on the Article I, section 9, possessory and privacy rights of an animal owner. *Cf. State v. Fessenden*, 258 Or App 639, 648-49, 310 P3d 1163, *rev allowed*, 354 Or 597 (2013) (noting that "the legislature cannot dictate which law enforcement actions comport with constitutional requirements and which do not," but considering state statutes as helpful for the limited purpose of determining whether there was a "societal interest" in emergency aid to animals under the judicially created emergency aid exception to the warrant requirement).[8]

That animals are sentient beings unlike other property may explain the *statutory* protections that animals receive, and those protections may otherwise provide support for this court's conclusion in *Nix* that animals are "victims" under ORS 161.067(2).[9] But it does not follow—and we do not understand the state to argue—that those statutory protections have a constitutional dimension. We conclude that a person who owns an animal does not have diminished *constitutional* possessory and privacy rights with respect to that animal—personal property by statute and under Article I, section 9—because the legislature has criminalized animal abuse and neglect.

The question remains whether any of the veterinarian's actions with respect to the dog invaded a protected

---

[8] The state has not argued that a warrant was excused here because of any emergency aid exception to the warrant requirement.

[9] In *Nix*, this court concluded that, for purposes of ORS 161.067(2), the victim of the offense of second-degree animal neglect was the animal itself, rather than the public at large or the owner. In reaching that conclusion, the court determined that, in enacting ORS 167.325, "*the legislature's* primary concern was to protect individual animals as sentient beings, rather than to vindicate a more generalized public interest in their welfare." 251 Or App at 461 (emphasis added). The court further concluded that, even though animals usually are the property of persons, the legislature "did not intend to protect the owners of animals when it enacted ORS 167.325," such that the owner of a neglected animal is the "victim" of the crime of animal neglect. *Id.* at 458. This court's opinion in *Nix* answered a question of statutory interpretation and, in doing so, it explicitly noted that animals often have the status of personal property, without addressing an animal owner's constitutional rights with respect to animals as property.

privacy interest of defendant. We start with the undisputed premise that the dog is defendant's personal property or, in constitutional terms, one of defendant's "effects." In a number of cases considering the examination of personal effects, we have held that government conduct that exposes information that is otherwise concealed or hidden in those effects impairs the owner's freedom from scrutiny. For example, in *State v. Portrey*, 134 Or App 460, 896 P2d 7 (1995), the police had the defendant's implied consent to come onto his porch. Nonetheless, the court concluded that the police could not pick up the boots left on the porch and examine the soles—at least, so long as the observation of the boots did not give police probable cause to seize the boots—because the "defendant's privacy interest continued in the articles on his front porch that were not entirely visible to someone standing there." *Id.* at 465. The court held that "[t]hat action by police regarding *concealed personal effects* implicates constitutional guarantees." *Id.* at 466 (emphasis added); *see also State v. Cardell*, 180 Or App 104, 109, 41 P3d 1111 (2002) (concluding that, when an officer touched the tires of a parked car while he was lawfully present in a driveway, he conducted an "illegal search and * * * the direct information that he obtained—*i.e.*, that the tires were hot—should be excluded").

We are mindful, however, that the freedom from scrutiny provided by Article I, section 9, must be determined "in light of the particular context in which the government conduct occurred." *Meredith*, 337 Or at 306. Thus, although police who are lawfully present on a person's porch may not examine concealed personal effects, the same is not necessarily true once police have lawfully seized those personal effects. As the Supreme Court explained in *Owens*, "[w]hen the police lawfully seize a container, they can thoroughly examine the container's exterior without violating any privacy interest of the owner or the person from whom the container was seized. *For example, the police can observe, feel, smell, shake and weigh it.*" 302 Or at 206 (emphasis added). When police have lawfully seized an object, then, government conduct that is coincident with their physical possession of the object—*e.g.*, observing, touching, and even weighing the object—does not violate the privacy interest of the owner.

That is not to say that a person's privacy interest is lost completely once her property is lawfully seized. Where police lawfully seized a pocketknife from a defendant during a search incident to arrest, for example, the police conducted a further "search" when they opened the pocketknife to expose the blade because opening the knife revealed information that was not readily apparent when the pocketknife was closed:

> "In this case, to the extent that it 'announced' anything, [the] defendant's closed pocketknife announced only that it contained a blade. Nothing in the pocketknife's appearance gave the officers reason to believe that the blade contained residue from tire slashings. Because opening the knife revealed evidence that was not otherwise exposed to public view, it was a search that required probable cause."

*State v. Dickerson*, 135 Or App 192, 195-96, 898 P2d 193 (1995); *see also State v. Munro*, 194 Or App 538, 545, 96 P3d 348 (2004) (concluding that the defendant retained a protected privacy interest in the contents of a videotape that police had lawfully seized), *rev'd*, 339 Or 545, 550, 553, 124 P3d 1221 (2005) (accepting the state's concession that viewing a lawfully seized videotape was a "search," but concluding that the search was authorized by a warrant); *State v. Heckathorne*, 347 Or 474, 483-85, 223 P3d 1034 (2009) (reaffirming the principle that opening a lawfully seized container that does not reveal or announce its contents is a search that must be justified by a warrant or an exception to the warrant requirement).

Those principles compel the conclusion that, although the officer lawfully seized defendant's dog, extracting and testing the dog's blood was a "search" under Article I, section 9.[10] The extraction of blood from the dog involved a physical intrusion into defendant's property, and the testing of blood

---

[10] Defendant treats the sampling and testing of the dog's blood and feces as one in the same, but defendant acknowledges that it is unclear how the dog's fecal matter was collected by the veterinarian. Because the record provides only a limited factual description of the tests performed and gives no information about how the feces were collected, we cannot tell if the fecal matter was extracted as part of the search of the dog. Our conclusion that extracting and testing the blood was a search requires reversal in this case. If the prosecution of defendant is pursued on remand, the trial court should reassess whether the fecal matter evidence should be suppressed under the principles stated herein.

"revealed evidence that was not otherwise exposed to public view" or to those who had lawful access to the dog while it was in the state's custody. *Dickerson*, 135 Or App at 196. Specifically, the tests revealed information about the dog's physiological condition, which, in turn, showed that the dog was healthy aside from being malnourished.

We acknowledge that animals are not simply repositories for their owners' information; animal owners do not typically use their animals to store or carry information like they would a briefcase or similar container. But in determining whether the police have invaded a defendant's privacy interest in her personal property, our analysis is not controlled by whether the item at issue—whether the soles of a pair of boots in *Portrey*, the pocketknife in *Dickerson*, or the tires in *Cardell*—is designed or used for the purpose of holding information. Nor, in that context, have we endeavored to assess whether the information that the examination revealed was particularly valuable to the item's owner or to society in general. Instead, what has driven our analysis is that the government actor engaged in "additional activity beyond that available to an ordinary observer * * * to obtain information" that was not otherwise exposed. *State v. Haney*, 153 Or App 642, 646, 958 P2d 192 (1998).[11] Accordingly, we conclude that the extraction and testing of the dog's blood implicates a privacy interest under Article I, section 9.

The same cannot be said as to defendant's separate claim that, after feeding the dog, the veterinarian invaded her privacy rights by weighing the dog every few days and recording the dog's weight gain. Defendant acknowledges that "simply feeding the dog was not a search," but she contends that, like the extraction and testing of the dog's blood,

---

[11] In the trial court, the state argued that the testing of the dog's blood and feces was not a "search" because it was akin to a confirmatory test on a substance to confirm the presence of drugs. *See Owens*, 302 Or at 206 ("When there is probable cause to believe that a lawfully seized substance is a controlled substance, a chemical test, for the sole purpose of determining whether or not it is a controlled substance, is neither a 'search' nor a 'seizure' under Article I, section 9."). Defendant responded that the tests on the dog's blood and feces here were "more invasive and intrusive * * *. They did a full chemical workup on blood tests, fecal matter, everything. And * * * the conclusion that they drew is that there's nothing wrong with this dog. But the way that they drew that conclusion was by analyzing its body chemistry, basically." On appeal, the state does not again raise that argument, and, accordingly, we do not address it.

weighing the dog over time "reveal[ed] information about the dog's health that would otherwise have remained concealed within its body." But the information that the weighing revealed—that the dog was gaining weight—would be apparent from the veterinarian's lawful observation of the dog.[12] Even if the dog's weight gain was more precisely measured by using a scale and recording the weight over time, that incremental intrusion beyond what was readily apparent to the veterinarian and those who had custody of the dog was not a "search" under Article I, section 9. *See Owens*, 302 Or at 206 (stating that weighing a lawfully seized container would not invade the owner's protected privacy interest).

In sum, we conclude that, although the officer's seizure of the dog was justified by the "plain view" exception to the warrant requirement, the veterinarian, acting on behalf of the state, conducted a warrantless search of the dog by extracting and testing its blood—an act that constituted a physical invasion of defendant's property and exposed otherwise concealed information about the dog that served as evidence of a crime. Because the state has not argued that the search of the dog was justified by an exception to the warrant requirement or that admission of the evidence was harmless,[13] our analysis ends there. By extracting and testing

---

[12] Defendant does not make any independent argument that weighing the dog and charting its weight was a "search" under the Fourth Amendment, apart from citing *U. S. v. Crist*, 627 F Supp 2d 575 (MD Pa 2008), which defendant describes as a case where the court held that "manipulating [the] defendant's computer to reveal information it contained was a search." For the reasons discussed above, charting the dog's weight was of a materially different quality than the invasive government conduct that the court in *Crist* determined was a "search" under the Fourth Amendment. *See id.* at 578-79 (describing an agent's removal and copying of the defendant's hard drive and the subsequent analysis of its files). We reject defendant's Fourth Amendment argument as to the recording of the dog's weight without further discussion.

[13] At oral argument on appeal, the state asserted that whatever privacy right defendant had in the dog, the search was reasonable under the circumstances. But the state—in its brief on appeal and in the proceedings in the trial court— never advanced any argument that the search in this case was reasonable under an established exception to the warrant requirement. (On appeal, defendant preemptively argued that the search did not qualify as an administrative search under Article I, section 9, but the state did not pursue that argument in its brief.) We note that the state also submitted a memorandum of additional authorities, citing *State ex rel Juv. Dept. v. M. A. D.*, 348 Or 381, 233 P3d 437 (2010), as a case where "the Oregon Supreme Court recognized a new exception to the warrant requirement for searches of school students." *See id.* at 394 (explaining that the rights of high school students against unreasonable intrusions by state officials,

the dog's blood, the state conducted a warrantless search of defendant's property in violation of defendant's Article I, section 9, rights, and evidence discovered as a result of that search should have been suppressed.

Reversed and remanded.

---

"like the rights of a person searched pursuant to a valid officer-safety search, must yield if the state officials can point to specific and articulable facts that reasonably create a risk of immediate and serious harm to the officials or others"). To the extent that the state presses for the recognition of a novel exception to the warrant requirement—such that a defendant's privacy rights must "yield" when a lawfully seized animal needs veterinary testing to satisfy some appropriate level of care—the state neither developed that argument on appeal nor presented that argument in the trial court.